**CITIZENS FOR ENVIRONMENTAL QUALITY, Plaintiff,**

**Colorado Environmental Coalition, Natural Resources Defense Council, the Wilderness Society, and National Audubon Society, Plaintiffs–Intervenors,**

v.

**The UNITED STATES, Richard A. Lyng, Secretary of the U.S. Department of Agriculture, F. Dale Robertson, Chief of the U.S. Forest Service and Gary E. Cargill, Regional Forester, U.S. Forest Service, Rocky Mountain Region, Defendants.**

Civ. A. No. 87–F–1714.

United States District Court, D. Colorado.

Aug. 24, 1989.

974

Frances M. Green, Boulder, Colo., and Grove T. Burnett, Glorieta, N.M., for plaintiff.

Michael J. Norton, Acting U.S. Atty., J. Greg Whitehair, Asst. U.S. Atty., Denver, Colo., and Wells D. Burgess, U.S. Dept. of Justice, Land and Natural Resources Div., Gen. Litigation Section, Washington, D.C., for defendants.

Ronald J. Wilson and F. Kaid Benfield, Natural Resources Defense Council, Washington, D.C., and David C. VonGunten and Michael J. Cook, Faegre & Benson, Denver, Colo., for plaintiffs-intervenors.

## ORDER AND MEMORANDUM OPINION OF LAW

SHERMAN G. FINESILVER, Chief Judge.

This case involves broad attacks by environmental groups on governmental plans for the management of a large forest in Colorado. In effect, the groups seek to nullify management plans which have been under study and development since 1981.

### I. *Parties*

Plaintiff:

Citizens for Environmental Quality

Plaintiff–Intervenors:

Colorado Environmental Coalition
Natural Resources Defense Council
The Wilderness Society
The Audubon Society

Defendants:

The United States of America
Richard A. Lyng, Secretary of the U.S. Department of Agriculture
F. Dale Robertson, Chief of the U.S. Forest Service
Gary E. Cargill, Regional Forester, U.S. Forest Service, Rocky Mountain Region

### II. *Jurisdiction*

This action arises under the National Forest Management Act ("NFMA") 16 U.S.C. §§ 1600–1614, and its implementing regulations, 36 C.F.R. Part 219; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* and its implementing regulations, 40 C.F.R. Parts 1500–1508; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.;* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

Jurisdiction is exercised pursuant to 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. §§ 2201, and 2202 (Declaratory Judgment and Further Relief).

### III. *Nature of the Litigation*

The parties have filed cross motions for summary judgment pursuant to Fed.R.

Civ.P. 56. Plaintiff Citizens for Environmental Quality and Plaintiff–Intervenors ("Intervenors") seek judicial review of an administrative decision by Defendants to issue a comprehensive Land Resource Management Plan ("LRMP" or "the Plan") for the Rio Grande National Forest.[1] Defendants Lyng, Robertson and Cargill as officials of the United States government are responsible for the direction and supervision of operations and activities of the Forest Service, a branch of the United States Department of Agriculture, and of the Rio Grande National Forest.

The present litigation centers on the issue of whether the National Forests should be used or preserved, and reflects the need for balancing the nation's legitimate economic needs with its limited natural resources. Congress addressed this problem in 1976 by passing the National Forest Management Act which directed the Secretary to develop, maintain, and revise LRMPs for units of the National Forest System ("NFS"). The task of satisfying the nation's need for timber and other forest products while preserving forest lands for the use of future generations is a complex one. Nonetheless, the NFMA contemplates that through careful planning and management, both economic and aesthetic needs will be met.

The potential impact of the NFMA planning process on the nation poses important environmental and economic issues. Of the 191 million acres included in the National Forest System, 108.1 million acres have been developed for recreation, logging and other uses; 32.5 million are protected as official wilderness, and an additional 50.4 million acres remain roadless with 5.5 million of them recommended for classification as wilderness.

In 1985, cash receipts from NFS activities amounted to $1.1 billion dollars in revenue, $225 million of which was returned to county governments for support of schools and roads. In the same year, recreational use amounted to 225 million visitor-days with an estimated assigned monetary value of about $2.2 billion. Forest plans average about $2.5 million each to develop.[2]

Pursuant to NFMA mandate, the U.S. Forest Service is in the final stages of developing LRMPs for all national forests. Because of the financial value of the resources at stake and the cost of producing plans, sixty-two final plans have been the subject of formal administrative appeals within the Forest Service. These appeals have reflected an intense concern that the plans resolve resource use issues, meet requirements of the NFMA, are financially feasible, and are politically supported by the people most affected. This case is among the first requesting broad judicial review of Forest Service decisions regarding forest land management plans. Additional litigation is anticipated as more of these plans reach the implementation stage.

IV. *Statutory and Regulatory Background*

By enacting the National Forest Management Act as an amendment to the Forest and Rangeland Resources Planning Act ("RPA"), Congress directed the Secretary of Agriculture ("Secretary") to develop, maintain and revise LRMPs for units of the National Forest System. 16 U.S.C. § 1604(a). LRMPs must provide for the multiple use and sustained yield of the products and services obtained from the Forest in accordance with the Multiple–Use Sustained–Yield Act of 1960. ("MUSY"), 16 U.S.C. §§ 528–531. *See also*, 16 U.S.C. §§ 1604(b), (d), and (e).[3]

1. The area covered by the Plan, the Rio Grande National Forest, is located in South Central Colorado and contains 1,851,792 acres of National Forest System lands.

2. *See* Teeguàrden, *Benefit–Cost Analysis in National Forest System Planning: Policy, Uses, and Limitations,* 17 Environmental Law 393 (1987).

3. "Multiple Use" in the forest context refers to the following uses, among others: outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 16 U.S.C. § 1604(e)(1). The multiple use standard directs the Secretary to coordinate management of the uses, giving consideration to the relative values thereof. 16 U.S.C. § 531; 36 C.F.R. § 219.3. LRMPs are to provide for all the multiple uses of the national forests.

The general procedure, content and process requirements for forest planning are set forth in regulations promulgated in 36 C.F.R. § 219. *See* 16 U.S.C. § 1604(h).[4] Under the regulations, the purpose of the LRMP is to provide for multiple use and sustained yield of goods and services from the National Forest System in a way that maximizes long term net public benefits in an environmentally sound manner. 36 C.F.R. § 219.1(a). The essential planning tool in implementing the multiple use/sustained yield mandate is a cost-benefit analysis, where both costs and benefits to which a monetary value can be assigned, and those to which no quantitative value can be assigned, are considered.[5] 36 C.F.R. § 219.3 (Definition of "net public benefits").

Under NFMA regulations, planning begins with the formal identification of purpose and need (§ 219.12(b)), the establishment of planning criteria (§ 219.12(c)), and the collection of data. § 219.12(d). Planning then proceeds through the formulation of a range of alternative management scenarios (§ 219.12(f)), the evaluation of those alternatives (§ 219.12(h)), and the formal recommendation and adoption of an alternative as the Plan. § 219.12(i) & (j). The regulations also provide for on-going monitoring and evaluation of the Plan. § 219.12(k).

The development of the Plan is based on a set of management prescriptions, each of which sets forth a strategy for managing all of the major resources of the forest. Each management prescription provides for various levels of goods and services and addresses issues and concerns raised in the public participation process. Each of the alternative management scenarios considered represents a different set of management prescriptions applied to different areas and resources of the forest to produce an array of outputs, goods, and services.

The LRMP defines the "management direction" for the forest. 36 C.F.R. §§ 219.-

1(b), 219.3. It constitutes a program for all natural resource management activities and establishes management requirements to be employed in implementing the plan. It identifies the resource management practices, the projected levels of production of goods and services, and the location where various types of resource management may occur. Implementation of the LRMP is achieved through individual site-specific projects, and all projects must be consistent with the LRMP. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e). LRMPs must be prepared in compliance with NEPA, (16 U.S.C. § 1604(g)(1)), and the regulations contemplate the preparation of an appropriate Environmental Impact Statement ("EIS") in compliance with NEPA together with LRMPs as part of an integrated process. 36 C.F.R. § 219.12.

The decisions of the Regional Forester in approving a LRMP may be categorized as:

1. Establishment of forest-wide multiple-use goals and objectives (36 C.F.R. § 219.11(b));

2. Establishment of forest-wide management requirements (standards and guidelines) to fulfill the requirements of the NFMA relating to future activities (resource integration requirements of 36 C.F.R. §§ 219.13 to 219.27);

3. Establishment of management area direction (management area prescriptions) applying to future management activities in that management area (36 C.F.R. § 219.11);

4. Designation of land suitable for timber production and the establishment of allowable timber sale quality (36 C.F.R. §§ 219.14 and 219.16);

5. Nonwilderness multiple-use allocations for those roadless areas that were reviewed under 36 C.F.R. § 219.17 and not recommended for wilderness designation;

---

4. The regulations were promulgated in 1979, following consultation with the Committee of Scientists. (44 Fed.Reg. 53928).

5. For a comprehensive discussion of the role of the cost–benefit analysis in LRMPs, *see* Teeguarden, *supra* note 2.

6. Monitoring and evaluation requirements (36 C.F.R. § 219.11(d)).

Of primary concern in this case is the designation of land suitable for timber production.

Section 219.14 sets forth a series of criteria for making the identification of lands suitable for timber production, together known as Stage 1. Under Stage 1, land is considered unsuitable for timber production if: (1) it currently and historically has less than 10% tree cover; (2) technology is not available to insure that timber production will not cause irreversible damage to soil or watersheds; (3) it cannot be restocked within 5 years; and (4) it has been administratively withdrawn from timber production.

Land which passes the Stage I criteria is considered tentatively suitable for timber production, and may be assigned production management prescriptions. The remaining criteria include two economic analyses. The first analysis requires an economic evaluation of management prescriptions as applied to particular analysis areas. This evaluation is referred to as Stage 2 analysis. The purpose of Stage 2 analysis is to determine the financial costs and measurable economic benefits of each management prescription.[6] In essence, it is designed to provide information on the financial attractiveness of the various proposed alternatives.

Stage 3 of the suitability determination process provides in part that lands are not suitable for timber production if they are not "cost-efficient"[7] in meeting the objectives of the alternative. 36 C.F.R. § 219.14(c). The consideration of cost-efficiency applies to the alternative as a whole, and not to timber production on a particular analysis area. Stage 3 is not a strict formulaic analysis that directly considers the financial costs and revenues associated with timber production on individual acres or analysis areas. Rather, it is a flexible analysis which must estimate the indeterminate values of non-economic benefits such as esthetics and recreation. The result of the Stage 3 analysis is the somewhat conclusory statement that all acres assigned to timber production in an alternative are suitable for timber production, and all areas which are not assigned to timber production are unsuitable.[8]

The basic documents resulting from the planning process are the LRMP, its accompanying Environmental Impact Statement, and the Record of Decision ("ROD") wherein the decision-maker (the Regional Forester) selects the management scenario which results in the greatest net benefit to the public. The selection is made after consideration of all factors, including both monetary and nonmonetary costs and benefits.

## V. *The Rio Grande National Forest Plan*

On February 12, 1981 the Forest Service published a Notice of Intent to prepare a Land Resource Management Plan and accompanying Environmental Impact Statement for the Rio Grande National Forest. 46 Fed.Reg. 12038. The Forest Service noted that preliminary public issues had been identified through analysis of public comments received in previous planning efforts and outlined the process it would follow, which included public involvement. The proceedings were documented in an administrative record filed with the court.

---

**6.** Forest Service, Department of Agriculture, *Forest Service Manual,* Title 1922.13 (1984).

**7.** The concept of cost efficiency combines the concepts of cost effectiveness and economic efficiency. However, many of the outputs or effects of forest management cannot be valued, and the output level of many nonprice and some priced outputs are specified as constraints in the formulation of alternatives. Thus, forest planners technically cannot measure the economic efficiency of an alternative. Instead, planners combine the concepts of cost effectiveness and economic efficiency and measure "cost

efficiency". Specified output levels are achieved, theoretically at least, by the most cost-effective method, and all priced outputs not produced at specified levels are produced at the most efficient level possible. Thus, every alternative is cost efficient. *See* Morrison, *infra* note 8 at 578.

**8.** For a thorough discussion of the suitability determination process, *See* Morrison, *The National Forest Management Act and Below Cost Timber Sales: Determining the Economic Suitability of Land for Timber Production,* 17 Environmental Law 557 (1987).

Copies of the draft Plan and draft EIS were distributed to the public, as well as to local governments, federal agencies and individuals, organizations, university faculty and businesses. Plaintiff reviewed the draft Plan and the draft EIS, and formally commented that FORPLAN I was difficult to use in the planning process. Plaintiff–Intervenors individually submitted comments on the Plan and EIS.

After considering the public comments, the Rio Grande National Forest modified the draft and prepared a final Plan and EIS. The EIS printed in full the comments received from those who chose to comment and responded to each of the comments raised. On January 4, 1985 the Regional Forester for the Rocky Mountain Region signed the Record of Decision ("ROD") approving the Plan and EIS.

Nine alternative plans with differing emphases were considered in the planning process including a "no action" alternative, a "market output" alternative, a "non-market" alternative, a "reduced budget" alternative, an "improved area economy" alternative, and a "low expenditure, high present value" alternative. Alternative A[9] was chosen as the Plan because it "... seem[s] to satisfy all the broad public policy goals ... [and] better serves pressing public needs for commercial products." Evaluation of Alternatives, p. 31.

The ROD describes the selected alternative as follows:

> The proposed action emphasize[s] opportunities to better serve community needs in the San Luis Valley. It provides opportunities to improve the condition of the Forest by regenerating overmature spruce, aspen and lodgepole pine stands and by improving winter ranges. This alternative would produce an increase in the amount of water available in the Rio Grande and Conejos Rivers, provide increasing volumes of timber for the Nation, provide greater amounts of fuelwood for surrounding communities, increase livestock grazing over time, and increase developed recreation, including downhill skiing.

Record of Decision, p. 27.

On February 19, 1985, Plaintiff filed an administrative appeal of the decision to adopt the Plan with the Chief of the Forest Service. In its appeal, Plaintiff alleged that the Plan and the EIS were legally deficient because:

(a) The FORPLAN computer model used in the development of the Plan was flawed;

(b) The EIS prepared by the Forest Service was deficient under NEPA for its failure to analyze the cumulative impacts of all timber harvesting on National Forests in Colorado;

(c) The Plan violated NFMA by failing to demonstrate the economic feasibility of projected timber sales;

(d) The Forest Service failed to comply with the Endangered Species Act, 16 U.S.C. § 1536, in connection with the adoption of the Plan.

On May 28, 1987 the Chief issued his decision denying the appeal which the Secretary did not review. The decision constitutes final agency action. 36 C.F.R. § 211.18(f)(4), (6).

## VI. *Summary of Claims and Issues*

Plaintiff and Intervenors bring claims under a host of federal statutes and regulations.[10] At issue in this case is the Forest Service's designation of land suitable for timber production and establishment of allowable timber sales under § 6(k) of the NFMA[11] and its implementing regulations

---

9. Alternative A is entitled "Moderate Market Opportunities" and is designed to produce moderate increases in water, fuelwood and forage supplies available in the Forest and increases commercial sawtimber production by 50%. (Formulation of Alternatives for the Rio Grande National Forest, p. 26).

10. The words of the poet characterize the general position of Plaintiff and Intervenors in this litigation:

> Woodman, spare that tree!
> Touch not a single bough,
> In youth it sheltered me,
> And I'll protect it now.

(George Pope Morris, 1802–1864).

11. That section reads:

set forth at 36 C.F.R. §§ 219.14 & 219.16. Plaintiff contests Defendants' use of the computer model FORPLAN I [12], alleging the following NFMA violations:

(1) failure to designate lands with unstable soils as unsuitable for timber production;

(2) failure to identify hazards to resources;

(3) failure to set forth an analysis identifying economically unsuitable lands;

(4) improper reliance on timber production goals in determining the suitability of lands for timber production; [13]

(5) failure to establish a cost efficient timber base;

(6) failure to establish a broad range of reasonable alternatives; and

(7) failure to adequately consider the estimated environmental effects of the proposed alternatives.

Plaintiff has filed additional claims under the NFMA alleging that Defendants failed to require an economic feasibility analysis of individual timber sales, (16 U.S.C. § 1604(g)(3)(F)(ii)), and failed to amend the Plan as required by agency regulations. 36 C.F.R. § 219.10(f).

Plaintiff's NEPA claim alleges that the final EIS for the Plan is inadequate and deficient because of its failure to adequately analyze (1) the environmental impact of timber harvesting on unstable soils and (2) the cumulative impacts of planned harvest-

ing on the Rio Grande National Forest. Plaintiff brings its final claim under the ESA alleging that Defendants failed to (1) provide direction for proposed timber management and road building, and (2) provide a list compiled by the U.S. Fish and Wildlife Service setting forth the endangered species possibly existing in individual timber sale areas.

Intervenors allege violations of the NFMA and the APA because of Defendants' use of certain constraints and assumptions in the FORPLAN I computer model. The following constraints are alleged to be unsupported and contrary to the Administrative Record:

(1) timber harvest constraints which preclude the consideration of management alternatives required by agency regulations; [14]

(2) outdated assumptions concerning timber prices which distorted economic calculations; and

(3) an erroneous assumption that the amount of timber offered by the Forest Service would have no effect on timber prices, further distorting economic analysis.

Intervenors further allege that Defendants acted contrary to law by failing to enforce the binding policy of the U.S. Department of Agriculture requiring economic analysis

---

In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for salvage sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years. Lands once identified as unsuitable for timber production shall continue to be treated for reforestation purposes, particularly with regard to the protection of other multiple-use values. The Secretary shall review his decision to classify these lands as not suited for timber production at least every 10 years and shall return these lands to timber production whenever he determines that conditions have changed so that they have become suitable for timber production. 16 U.S.C. § 1604(k).

12. FORPLAN I is a computer analysis model used by the Forest Service to compare and evaluate alternative LRMPs. Through linear programming, FORPLAN I analyzes and describes how a forest may be expected to respond to anticipated management. Plaintiff's original first claim, which alleged that FORPLAN I was a fundamentally flawed tool to use in the planning process and the preparation of the Rio Grande Forest Plan, was dismissed at oral hearing by stipulation of the parties.

13. Plaintiff–Intervenors have filed a similar claim alleging violation of NFMA and the Administrative Procedure Act ("APA"), (5 U.S.C. § 500, et seq.) for the improper use of timber production goals.

14. We consider this claim in conjunction with Plaintiff's claim that Defendants failed to establish a broad range of reasonable alternatives.

and disclosure in the Rio Grande Record of Decision.

Plaintiff requests the following declaratory relief:

(1) That the Plan violates the NFMA because the underlying planning process is fundamentally flawed by Defendants' improper use of FOR-PLAN;

(2) That the Plan violates the NFMA because it failed to require an economic analysis of individual timber sales;

(3) That the final EIS for the Rio Grande National Forest Plan violates NEPA;

(4) That the Plan violates the ESA.

Plaintiff asks that Defendants' approval of the Plan be set aside and that Defendants be ordered to prepare a supplemental EIS in accordance with NEPA and to prepare an amended Plan which uses FORPLAN in accordance with the NFMA. Plaintiff also seeks costs and attorney's fees resulting from this litigation.

Intervenors seek a declaratory order that Defendants' action in approving the Plan was arbitrary and not in accordance with law. Intervenors further request a permanent injunction limiting timber sales from the Forest to 25 MMBF (million board feet) per year until the Plan is amended to correct its legal deficiencies.

Defendants generally deny the above allegations and assert that Intervenors failed to exhaust their administrative remedies, and that their claims are otherwise barred by the doctrine of laches.

We have reviewed the administrative record, and have considered the parties' respective briefs along with the evidence adduced at oral argument. While we decide and order additional study and analysis in some particular areas of the Rio Grande Plan, we do not require Defendants to begin the entire planning process anew.

Plaintiff's and Intervenors' request for declaratory relief is GRANTED IN PART. Plaintiff's request for injunctive relief is GRANTED IN PART. Intervenors' request for permanent injunctive relief is DENIED. The Plan is REMANDED to the agency for reconsideration of the issues and amendment of the Plan as more fully set forth below.

Our holding on each of the above claims is summarized as follows:

1. We hold that the Plan's provision for on-going, site specific soil studies complies with the requirements of §§ 6(k) and 6(g)(3) for the protection of unstable soils; however, in relying upon the technology exception of 36 C.F.R. § 219.14(a)(2), Defendants failed to identify the technology which would be employed to prevent irreversible damage to soil resources;

2. Plaintiff has failed to state a claim under 16 U.S.C. § 1604(g)(2)(C) regarding Defendants' identification of hazards to resources;

3. Defendants failed to provide an adequate explanation of economic factors, and failed to properly conduct an economic efficiency analysis as required by 36 C.F.R. § 219.14(b) and agency precedent. (*See* Secretary's Decisions for the San Juan and Grande Mesa, Uncompahgre, and Gunnison ("GMUG") National Forests);

4. Defendants failed to adequately explain why timber production goals were allowed to control the results of the timber production suitability analysis; however, Plaintiff failed to establish that Defendants' cost efficiency analysis is an unreasonable departure from required procedure, or that it is an arbitrary or capricious substantive decision.

5. Defendants' use of a result biased decision making process prevented Defendants from establishing a broad range of alternatives as required by 36 C.F.R. § 219.12(f), and in any event, Defendants failed to adequately consider those alternatives which they formulated;

6. Defendants adequately considered the environmental effects on visual resources and water quality in the formulation of the plan as required by 36 C.F.R. §§ 219.12(g) and (h)

and 40 C.F.R. §§ 1502.14 and 1502.-16; however, Defendants failed to specifically address the Plan's compliance with the Clean Water Act as required by 36 C.F.R. § 219.23;

7. Neither the NFMA nor its implementing regulations require that an economic feasibility analysis for individual timber sales be carried out in the LRMP;

8. Plaintiff has failed to exhaust its administrative remedies in asking that the Plan be amended due to post-plan events;

9. Intervenors' action is not time-barred by the doctrine of laches, and was sufficiently presented at the administrative level to be subject to judicial review; Defendants failed to adequately explain why more current price data was not used in the formulation of the Plan; Defendants did not err in utilizing a horizontal demand curve in analyzing timber prices and related matters;

10. Defendants' EIS complied with NEPA since it provided for on-going, site specific impact studies to take place prior to the implementation of soil disturbing activities; There is no requirement that the EIS set forth a discussion of cumulative impacts, since such a discussion is to take place prior to the issuance of the EIS;

11. Plaintiff has failed to state a claim under the Endangered Species Act.

## VII. *Scope of Review*

■ Defendants argue that this court may not go beyond the administrative record in this case. We disagree. The predominant rule regarding a court's scope of review may be summarized as follows:

[A]gency action must be examined by scrutinizing the administrative record at the time the agency made its decision.

*Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1159 (9th Cir.1980). We recognize the principal that when a reviewing court considers evidence outside the administrative record, it runs the risk of improperly substituting its judgment for that of the agency. The court must only consider whether the Forest Service made an erroneous decision based on the record before it. "If the court determines that the agency's course of inquiry was insufficient or inadequate, it ... [will] remand the matter to the agency." *Asarco,* 616 F.2d at 1160; *Proietti v. Levi,* 530 F.2d 836, 838 (9th Cir.1976); *Southeast Alaska Conservation Council v. Watson,* 526 F.Supp. 202, 206 (D.Alaska 1981).

However, our review of the agency decision is upon the whole record, and therefore the court may supplement the record submitted by the agency with matters which were omitted therefrom, but which were considered, either directly or indirectly, by the agency in rendering its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971).

There are limited exceptions when consideration of evidence outside the administrative record is necessary to explain agency action. *Friends of the Earth v. Hintz, et al.,* 800 F.2d 822, 830 (9th Cir.1986). When there is "such a failure to explain administrative action as to frustrate effective judicial review, the court may obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary." *Id.,* quoting *Public Power Council v. Johnson,* 674 F.2d 791, 793–94 (9th Cir.1982). The court cannot, however, affirm any agency action accepting post hoc rationalizations of counsel that are not grounded in the administrative record. *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

■ Specifically, Defendants oppose the admission of the affidavits of Alan McQuillan and Randall O'Toole (Plaintiff's Exhibits 1 & 7, respectively), both experts in the use of computer models in forest planning. The affidavits are admitted as evidence. In the affidavits, Dr. McQuillen and Mr. O'Toole address the Forest Service's use of

the FORPLAN computer model in arriving at its LRMP. The affidavits are helpful to our understanding of the complex issues presented by this case and therefore necessary to effective judicial review. The affidavits illuminate the information contained in the administrative record and serve as points of reference therein.

## VIII. *Standard of Review*

■ Judicial review of LRMPs is unlike the review of typical agency decisions. We must consider the technical complexity of the issues involved, and the possibility that years of costly research and planning may be undone in the event of a remand to the agency. It is generally accepted that federal agencies are entitled to a presumption of good faith and regularity in arriving at their decisions. *Sierra Club v. Costle*, 657 F.2d 298, 334 (D.C.Cir.1981). Nonetheless, we must resist the temptation to "rubber stamp" agency decisions in the face of complex issues, and act to ensure that Forest Service decisions meet the required standards of regularity and rationality.

■ In reviewing the Forest Service's procedural decisions, we have considered whether the action was reasonable. *Portela v. Pierce*, 650 F.2d 210, 213 (9th Cir. 1981). In the instant case, the reasonableness of the procedural decisions is dependant upon whether the Forest Service complied with the requirements and regulations of the National Forest Management Act, the National Environmental Policy Act, and the Endangered Species Act.

■ As we consider the Forest Service's substantive decisions, we look to § 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. § 701–06 (1976). *Portela*, 650 F.2d at 213. Subsection (A) requires a court to set aside the Forest Service decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." APA § 706(2)(A). When applying subsection (A), we must consider whether the decision is based "on a consideration of all the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91

S.Ct. at 823. If, however, the Forest Service fails to provide a reasonable basis for the procedural decisions, we need not reach the merits of the substantive decisions.

## IX. *The NFMA Claims*

Plaintiff asserts that the Rio Grande Forest Plan violates the NFMA because Defendants improperly applied the computer model FORPLAN I for the following reasons.

### 1. Unstable Soils

Plaintiff alleges that the Forest Service misapplied FORPLAN by failing to remove lands with unstable soils from timber production as required by §§ 6(k) and 6(g)(3). Defendants contend that they have complied with these sections by promulgating appropriate regulations in 36 C.F.R. § 219.14. Specifically, Defendants defend their suitability determination on the basis of compliance with the technology exception of § 219.14(a)(2). Plaintiff attacks the implementing regulations both facially and as applied.

A review of the statutory and regulatory framework is necessary to an analysis of this issue. Section 6(k) provides that, when developing LRMPs, the Forest Service

shall identify lands within the management area which are not suited for timber production, considering physical ... factors ... and shall assure that ... no timber harvesting shall occur on such lands for a period of 10 years.

16 U.S.C. § 1604(k). Section 6(g)(3) requires the Secretary to promulgate regulations which

"shall include, but not be limited to ... (3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

(E) insure that timber will be harvested from National Forest System lands only where—

(i) soil, slope or watershed conditions will not be irreversibly damaged."

16 U.S.C. § 1604(g)(3)(E)(i).

The applicable implementing regulation reads as follows:

During the forest planning process, lands which are not suited for timber produc-

tion shall be identified in accordance with the criteria in paragraphs (a) through (d) of this section.

(a) During the analysis of the management situation, data on all National Forest System lands within the planning area shall be reviewed, and those lands within any one of the categories described in paragraphs (a)(1) through (4) of this section shall be identified as not suited for timber production—

(2) Technology is not available to ensure timber production from the land without irreversible resource damage to soils productivity, or watershed conditions.

36 C.F.R. § 219.14(a)(2).

The Forest Service applied this regulation in its Analysis of the Management Situation (AMS), where it set forth its determination of the availability, capability and suitability of lands for timber production. AMS, Ch. VII. The Forest Service stated:

Two physical suitability tests are required in the process to determine if land is suitable for timber production.

1. The first test is whether technology is available that will ensure that timber production activities, including harvesting, can occur on the land without irreversible resource damage to soil productivity or watershed condition. Availability of technology is judged on whether technology is currently developed and available for use. *This is not an economic test, and the technology does not have to be available in the local area.* It has been determined that the technology is available to harvest timber from all areas of the Forest while adequately protecting the soil and water resources.

AMS, Ch. VII (Emphasis added in AMS).

■ Plaintiff submits that 36 C.F.R. § 219.14(a)(2) and the Forest Service's re-

liance thereon do not conform to Congress' intent as expressed in §§ 6(g) and 6(k). Plaintiff argues that the primary intent of § 6(g) is to remove lands from timber production which are "physically unsuitable." We disagree. The intent of § 6(g)(3) is to insure against irreversible damage to soil, slope and watershed conditions. The section does not require the prevention of any and all damage to the above conditions as a result of timber harvesting.

■ In our view, Section 6(g)(3) contemplates that timber harvesting may be carried out even though such harvesting may cause temporary or short-term damage to soil and watershed conditions. Section 6(g)(3) goes no farther than to charge the Secretary with the duty of promulgating regulations to insure that soil, slope and watershed conditions will not be irreversibly damaged as a result of timber harvesting. The Secretary's regulation provides adequate guidelines for insuring against such irreversible damage. 36 C.F.R. § 219.14. This regulation is consistent with the language and intent of §§ 6(g) and 6(k).[15]

■ Plaintiff alleges in the alternative that Forest planners failed to properly implement the statutory and regulatory scheme. Plaintiff claims that Defendants erred by not identifying any lands as unsuitable for timber management on the basis of soil instability, despite uncontroverted evidence that the forest had significant problems with unstable soils. Plaintiff relies on the deposition testimony of John Bethke, a Forester for the Rio Grande National Forest. Bethke stated that Forest Service personnel did not identify lands as unsuitable for timber production, and that the planning team intended to identify such lands on a project-by-project basis. Bethke Deposition at 18.

---

**15.** Our interpretation of these sections is supported by the recommendations of the Committee of Scientists, whose report formed the basis for the Secretary's procedure for determining land suitability. (Final Report of the Committee of Scientists, 44 Fed.Reg. 26,599, 26,629–35 (1979) (hereafter, "Final Report")). In that report, one of the criteria used for land suitability for timber production was "no irreversible damage to soil or watershed conditions." (Final Report, 44 Fed.Reg. at 26,633).

We find no error in such an on-going identification provision. As stated above, the underlying purpose of § 6(g) and § 219.14 is the prevention of irreversible damage to soil and watershed conditions. In furtherance of this purpose, the identification of unsuitable lands is to take place "during the analysis of the management situation" when "data on all National Forest System lands within the Planning area ... shall be reviewed." 36 C.F.R. § 219.14(a).[16]

We interpret the term "data" to mean data which is sufficient to a well reasoned decision. This section does not, as Plaintiff argues, require that the entire planning process be stopped because of an incomplete data base. Rather, it requires that if there is insufficient data to a well reasoned decision, then provisions must be made for the completion of the necessary data base before projects are implemented.

In the instant case, the Forest Service made its identification of suitable lands without the benefit of a completed soil inventory.[17] However, the Plan makes provisions for on-going site specific surveys before implementation of soil disturbing projects. (Final EIS III–73). This provision fulfills the intent of § 6(g), i.e. to prevent irreversible damage to soil resources. *See Environmental Defense Fund v. Andrus*, 619 F.2d 1368, 1382 (10th Cir.1980) (continuing provision is sufficient for compliance with NEPA because it comports with the overall purpose of protection of the environment and informed decision making).

■ Defendants rely on the technology exception of 36 C.F.R. § 219.14(a)(2) as justification for the Plan's suitability determination. AMS Ch. VII. We interpret § 219.14(a)(2) as follows. If there exists technology which is capable of adequately repairing short-term damage due to timber harvesting within a reasonable time, and provisions are made for the use of that technology, then timber production may be carried out despite whatever short-term damage may be caused. However, where timber harvesting is contemplated on potentially unsuitable lands, then the technology to be used in preventing irreversible damage must be identified and provisions made for its implementation.

In our view, the Forest Service erred by its failure to adequately identify the technology which would allow it to proceed with timber harvesting under § 219.14(a)(2). The EIS stated that there were no forested areas which were technologically unsuitable for timber production. EIS III–54. However, the EIS did not specifically identify the technology which would be employed to protect these resources. Likewise, the Forest Service's

---

**16.** The Analysis of the Management Situation is a determination of the ability of the planning area covered by the forest plan to supply goods and services in response to society's demands. The primary purpose of this analysis is to provide a basis for formulating a broad range of reasonable alternatives. 36 C.F.R. § 219.12(e).

**17.** An exhaustive soil survey was made on the West Part of the Rio Grande Forest, which included an evaluation of soil characteristics throughout various parts (map units) of the Forest. The study evaluates problems such as landslides, road feasibility, vegetation, and erosion as they relate to each map unit. The study designates some areas as having high mass movement potential, other areas as having high water erosion hazards, and still others as unsuitable for management techniques.

For example, the evaluation of the Cochetopa–Harkness Association, an area within the Rio Grande National Forest, states: "Mass movement potential on this unit is high ... The possibility for mass movement will be increased on steep slopes and in seep areas. Such areas should be avoided in locating roads. An on-site investigation is highly recommended prior to any management activity in this area." (Soil Survey of Rio Grande National Forest—West Part, Colorado p. 58).

The Land Resource Management Plan for the Rio Grande Forest includes in its section on management direction a discussion of soil resource management which sets forth general directions, standards, and guidelines for achieving the desired goals. (LRMP III–66). The EIS also considers the Plan's potential effects on soil quality. (EIS IV–116). However, the LRMP does not discuss the soil survey, and while the EIS does incorporate some of the findings of the soil survey and proposes solutions to identified problems, it does so only in a general fashion. (EIS III–73). The ROD does not specifically refer to any of the above documents, instead referring only in general terms to soil erosion problems. (ROD, p. 8).

conclusory statement in its AMS that such technology exists is arbitrary and does not comply with this section. AMS, Ch. VII.

Defendants are DIRECTED to review the Planning documents and identify the technology upon which they rely for the § 219.14(a)(2) exception, and outline the provisions for its implementation.

### 2. Hazards to Resources

 Plaintiff contends that Defendants failed to identify hazards to resources as required by 16 U.S.C. § 1604(g)(2)(C). That section requires that regulations be promulgated which include

(2) specifying guidelines which—

(C) provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternative activities.

Plaintiff argues that if this section had been properly implemented, lands with unstable soils would have been identified as a special condition and withdrawn from timber production.

This conclusory and speculative argument fails to state a claim. Plaintiff alleges no specific procedural or substantive violation of the statute or of its implementing regulations, but merely states that Defendants violated NFMA by failing to identify hazards to resources. Plaintiff misinterprets the statutory mandate of Section 1604(g)(2)(C). That section requires only that regulations be promulgated which establish methods of identifying hazards to resources. It does not require that hazards be identified even if they do not exist.

Our review reveals that regulations were promulgated which establish methods of identifying hazards to fish and wildlife resources, grazing resources, recreation resources, mineral resources, water and soil resources, and cultural and historic resources. 36 C.F.R. §§ 219.19–219.24. These regulations comply with the mandate of § 1604(g)(2)(C). The record reveals that these resources were considered in the FEIS and the LRMP. FEIS Ch. IV; LRMP Ch. III. Plaintiff has failed to state a claim under 16 U.S.C. § 1604(g)(2)(C).

### 3. Agency Precedent/Economically Suitable Lands

Intervenors claim that Defendants failed to follow Agency precedent as set forth in the Secretary's decision on the San Juan and Grande Mesa, Uncompahgre, and Gunnison National Forests. Intervenors assert that the Secretary's decision in that case requires the Forest Service to conduct a particularly rigorous analysis when it contemplates an unprofitable timber sale program and attempts to justify that program on the basis that it will benefit other, non-timber aspects of forest management. Plaintiff makes a similar claim alleging that Defendants failed to conduct an economic efficiency analysis as required by 36 C.F.R. § 219.14(b) and the Secretary's San Juan/GMUG decision.

Defendants claim that the Secretary's San Juan/GMUG decision has limited application to the Rio Grande Plan, and in any event, the Rio Grande Plan has complied with the applicable portions of the Secretary's previous decision. We disagree.

 An agency must abide by established norms and policies unless it provides a convincing reason why a departure from its policies is justified. *Grace Petroleum Corp. v. F.E.R.C.*, 815 F.2d 589, 591 (10th Cir.1987). Agencies must also treat similar cases in a like fashion. *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir.1978).

The San Juan/GMUG decision is set forth in a Memorandum from Deputy Assistant Secretary of Agriculture Douglas MacCleery to Forest Service Chief Max Peterson. ("MacCleery Decision", Ad.Rec. p. 242). Additional interpretation of this decision is provided by Deputy Chief James Overbay in a Memorandum to Regional Foresters. ("Overbay Memo").

 In arguing that the San Juan/GMUG decision does not apply to the Rio Grande Plan, Defendants contend that it applies only to Forests which (1) propose an expansion of a timber program in which projected timber sale revenues would fall short of projected timber costs for the entire planning horizon, *and* (2) projects that

the bulk of the costs would be for road construction and timber management activities while the bulk of the benefits would be nontimber and nonmarket benefits resulting from the vegetation management effects of the timber program. Overbay Memo p. 3.

The MacCleery decision should not be read so restrictively. The MacCleery Decision was based on the fact that:

[T]he selected alternatives for both national forests would permit an increase in timber sales from recently experienced levels ... and therefore, the planning documents must discuss and rationalize this possibility.

Ad.Rec., p. 242. The alternative selected for the Rio Grande Plan permits an increase in timber sales from recently experienced sales. The decision further states:

A particularly strong obligation is imposed on the Forest Service to explain the economic, social and environmental tradeoffs which are likely to occur when resource objectives or responses to public issues are proposed which would reduce economic efficiency (reduce present net value). Decision Letter, p. 6.

The alternative adopted for the Rio Grande Forest significantly reduces present net value ("PNV") from the Current Program. ROD p. 24. Nowhere does the Deputy Secretary specifically limit his evaluation of the San Juan and GMUG National Forests to those forests. The present case is sufficiently similar to the San Juan/GMUG forests for the MacCleery guidelines to apply.

The MacCleery decision proposes the following guideline questions which the Forest Service should address:

Is the timber program as currently proposed actually the most effective way to achieve the non-timber multiple use objectives of the plan? To what extent can timber program costs be cut and/or revenues be enhanced while still providing an appropriate level of non-timber multiple use objectives? Are there other ways to

accomplish vegetation management more cost effectively than through a timber program as currently proposed?

Ad.Rec. p. 242.[18] The Secretary further directed the Forest Service to address several issues regarding Stage 2 economic analysis: the agency should discuss the results and implications of the Stage 2 financial analysis in the planning documents distributed to the public; the planning documents should describe how this information was used in the development and selection of prescriptions to be applied to specific analysis areas; and the documents should describe how the agency used this information in the formulation of alternatives. Overbay Memo, p. 5.[19]

The Secretary's decision also emphasized the need for the Regional Forester to fully explain the economic implications of the planning alternatives in the ROD. The ROD must explain why the Regional Forester believes the plan will provide greater overall net public benefits than other alternatives and the explanatory burden is increased if the selected alternative has a lower present net value than other alternatives. MacCleery Decision, p. 6.

Specifically, the Secretary's Decision requires the ROD to set forth a comprehensive analysis addressing the following areas:

(1) the difference between the net value and mix of the priced outputs that could be realized in implementing alternative(s) having a higher PNV and the net value and mix of the priced outputs anticipated if the selected alternative were to be implemented; (2) the objectives of the selected alternative in terms of priced and non-priced outputs and/or responses to expressed public issues that would not be expected to be realized if the alternative(s) having a higher PNV were implemented; (3) a summary in the ROD of the trade-offs or differences between (1) and (2) expressed in economic, environ-

---

**18.** The MacCleery Decision lists other guideline questions as well. (Ad.Rec. p. 242).

**19.** Before the Secretary's decision, such planning documents rarely displayed the results of

the Stage 2 analysis or explain its use in designing prescriptions or alternatives. *See* Morrison, *supra* note 8, at 577.

mental, physical and/or other appropriate quantitative and qualitative terms; and (4) an explanation as to why the selected alternative is expected to provide greater overall net public benefits that the alternative(s) with a higher PNV.

(Ad.Rec. p. 242).

The planning documents and the ROD fail to comply with the standards set forth by the Secretary. Defendants do not set forth a Stage 2 analysis nor do they identify where such an analysis has taken place. While Defendants allude to some of the above criteria in various documents, the ROD does not contain the overall synthesis contemplated by the Secretary. The Alternative selected for the Plan was ranked seventh in PNV (Present Net Value),[20] yet no rationale for this was set forth as required by agency precedent. Until these issues, and the others identified by the Secretary, are addressed the planning process is procedurally deficient.

Defendants are DIRECTED to review the planning documents, and conduct a Stage 2 analysis according to the Secretary's San Juan/GMUG decision and revise the ROD accordingly. If an alternative with a lower PNV is selected, then Defendants are DIRECTED to set forth a comprehensive explanation. Defendants are further DIRECTED to review the Plan in light of the Secretary's Decision Letter and the Overbay Memo to assure compliance and uniformity in agency matters.

### 4. Timber Production Goals/Cost Efficient Timber Base

▇ Intervenors join Plaintiff in alleging that Defendants improperly relied upon timber production goals in determining the suitable timber base for timber production in the Rio Grande Forest. Plaintiff and Intervenors claim that allowing predetermined production goals to weight the timber suitability analysis violates the intent of Section 6(k).

**20.** Record of Decision, p. 24–25.

**21.** "Cost efficiency" is defined as follows:
*Cost efficiency:* The usefulness of specified inputs (costs) to produce specified outputs (benefits). In measuring cost efficiency,

Defendants reply that timber production goals are a relevant factor in determining the suitability of lands for timber production. Defendants rely on the provisions of § 6(k) earlier outlined and the following implementing regulation:

Lands shall be tentatively identified as not appropriate for timber production to meet objectives of the alternative being considered if—

(3) The lands are not cost efficient, over the planning horizon, in meeting forest objectives, which include timber production.

36 C.F.R. § 219.14(c)(3).

We disagree with Plaintiff's contention that production goals may not be used in determining the suitability of lands. Section 6(k) provides the Forest Service with ample discretion to consider both economic and other pertinent factors in identifying land suitable for timber production. Section 219.14(c)(3) provides for the consideration of production goals as part of this discretion. In general, an agency's contemporaneous construction of its responsibilities under its enabling statute is entitled to deference. *ALCOA v. Central People's Utility District,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984). There is no reason to depart from the general rule.

However, we find that if production goals are to be given greater weight in the suitability analysis, then adequate reasons must be set forth for so doing. Defendants must provide justification for allowing production goals, or any other factor required by § 6(k) and the regulations, to weigh more heavily than other factors. In the instant case, no such justification has been set forth.

Plaintiff argues alternatively that even if the above regulations are held to be valid, the suitable timber base proposed by the Plan violates those regulations because it is not cost-efficient[21] as required by

some outputs, including environmental, economic, or social impacts, are not assigned monetary values but are achieved at specified levels in the least cost manner. Cost efficiency is usually measured using present net val-

§ 219.14(c)(3). Lands which are tentatively identified as not appropriate for timber production under this subsection are to be designated as not suited for timber production in the preferred alternative. 36 C.F.R. § 219.14(d).

Plaintiff argues that Defendants' analysis was fundamentally flawed so that it could not correctly identify cost inefficient alternatives. Plaintiff relies on the affidavit of Randal O'Toole which states that the planners failed to stratify the Forest into "categories of land with similar management costs and returns." 36 C.F.R. § 219.14(b). Specifically, Plaintiff claims that the analysis erred by failing to identify those areas of the forest which are roaded and those which are not.

 Plaintiff has failed to establish that Defendants' cost efficiency analysis was an un⸱asonable departure from required procedure, or that it is an arbitrary or capricious substantive decision. Plaintiff relies solely on the opinion testimony of one expert to refute the analysis of the agency. Randall O'Toole Affidavit. This is insufficient to overcome the presumption of correctness which an agency enjoys in its area of expertise, particularly when a statute charges an agency with heavy analytical responsibilities but no indication as to how they should be performed. *See, California v. Watt*, 668 F.2d 1290, 1320 (D.C.Cir.1981).

Defendants are DIRECTED to review the planning documents and set forth the justification for allowing production goals to weight the analysis. In all other particulars, the contentions of Plaintiff and Intervenors are rejected.

### 5. Broad Range of Reasonable Alternatives

 We agree with Plaintiff and Intervenors that the Rio Grande Forest Plan failed to formulate a broad range of alternatives in violation of Forest Service regu-

lation 36 C.F.R. § 219.12(f). That section provides:

> The interdisciplinary team shall formulate a broad range of reasonable alternatives according to NEPA procedures. The primary goal in formulating alternatives, besides complying with NEPA procedures, is to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits....

This section requires that the Forest Service take a "hard look" at alternatives which not only emphasize differing factors, but lead to differing results. Consideration of alternatives which lead to similar results is not sufficient under NEPA and this section. *State of California v. Block*, 690 F.2d 753 (9th Cir.1982).

The Forest Planners considered nine alternatives in arriving at the LRMP for the Rio Grande National Forest. Among the alternatives were a "no action alternative", a "market output" alternative, a "non-market" alternative, and a "reduced budget" alternative. Two of the alternatives (Alternatives E and I) provide for a reduction in timber production from current levels. Intervenors claim that Defendant's use of harvest level constraints in its FORPLAN model skewed the formulation of alternatives analysis so that no alternative which harvested timber at an overall profitable level could be considered.[22] Intervenors allege that this failure prevented the agency from considering a broad range of alternatives as required by 36 C.F.R. § 219.12(f).

 From the record, it appears that the Forest Service first established production goals, and then formulated alternatives which would reach those goals through employing data constraints. The remaining lands were then declared to be unsuitable for timber production after the

---

ue, although use of benefit-cost ratios and rates-of-return may be appropriate. 36 C.F.R. § 219.3.

**22.** Intervenors contend that the alternative with the lowest timber harvest level (Alternative F)

was constrained by FORPLAN to harvest an amount equal to 80% of the amount harvested in recent years, an amount which is 35% below what Intervenors believe to be the profitable level.

production goals had been satisfied.[23] We have earlier held that production goals may be used in determining the suitable timber base for timber harvesting. However, we also ruled that such goals may not control the suitability analysis absent adequate explanation. Similarly, Defendants provide no adequate justification for allowing production goals to control the formulation of alternatives.

We find that this result-biased decision making process prevented the Forest Service from establishing a legitimately broad range of reasonable alternatives as required by the statutory and regulatory scheme. The intent behind § 219.12(f) is clear—to establish a legitimately balanced range of proposed actions which reflect a wide range of goals. Defendants' range of alternatives cannot be said to reflect a wide range of goals since the proposed alternatives each contemplate timber production at a highly unprofitable level. A broad range of alternatives must also include an alternative which contemplates timber harvesting at a profitable level even if that level requires reducing current timber production levels.

We do not hold that an alternative which provides for profitable timber production must be selected. We merely hold that it must be considered in the same way as other alternatives. Defendants are DIRECTED to review an alternative which is based on a profitable timber production program and set forth reasons for its selection or rejection.

We are not persuaded that Defendants adequately considered each of the alternatives which were developed during the planning process. In its Evaluation of Alternatives, the Forest Service "readily dismissed" Alternatives E and I stating:

Alternatives E, F and I [do not] provide commercial timber yields or make available forage and grazing lands in amounts necessary to satisfy pressing public needs. There are both local and nation (sic) needs for these materials and resources, but local needs for them are genuinely pressing and urgent.

(Evaluation of Alternatives, p. 31). No data is cited in support of the proposition that there are "pressing public needs" for an increase in timber production.

From its evaluation, it is clear that the Forest Service gave a "hard look" only to those alternatives which increased timber production. Alternatives which reduced timber production were "readily dismissed". The Forest Service thus considered only alternatives which led to a similar result—increased timber production. This does not constitute a consideration of a broad range of alternatives as contemplated by § 219.12(f). While nothing prevents the Forest Service from adopting an alternative which increases timber production, this does not permit the Forest Service to seriously consider only those alternatives which provide for increased timber production, to the exclusion of alternatives which do not have the same end result. *State of California v. Block*, 690 F.2d at 768.

### 6. Environmental Effects

Plaintiff asserts that both the Plan and the FEIS fail to adequately consider the estimated environmental effects of the proposed alternatives in violation of 36 C.F.R. § 219.12(g) and (h)[24] and 40 C.F.R. §§ 1502.14 and 1502.16. Plaintiff alleges that Defendants failed to comply with § 219.23(d) which requires estimates of the Plan's compliance with the Clean Water Act, and § 219.21(f) which states "the visual resource shall be ... evaluated as an

---

**23.** Such logic has been employed previously by the Forest Service. *See* Repetto, *Public Policies and the Misuse of Forest Resources* (Cambridge University Press 1988), pp. 355–56 ("At present, production targets thus determine the areas deemed economically suitable for harvesting, not the reverse").

**24.** Section 219.12(g) provides:

The physical, biological, economic, and social effects of implementing each alternative considered in detail shall be estimated and compared according to NEPA procedures.

Section 219.12(h) provides:

Using planning criteria, the interdisciplinary team shall evaluate the significant physical, biological, economic, and social effects of each management alternative that is considered in detail.

integral part of evaluating alternatives." Plaintiff argues that the estimation of environmental effects was deficient because important resources were not included in FORPLAN, inadequate computer techniques were used, and that no technique was used to estimate environmental effects.

Defendants argue that those resources which were not included in FORPLAN were considered elsewhere in the planning process. Defendant's Brief, p. 40. Defendants contend that the planners examined the economic implications of the planning alternatives in the FEIS and in several planning items, and explained the economic, social and environmental tradeoffs in the FEIS, the Administrative Record for the ROD, and various Planning Record Items. We have examined the record and find that Defendants have complied with the requirements of § 219.12(g). *See* FEIS Ch. IV.

Contrary to Plaintiff's assertion, the effects on visual resources were considered in the Plan and FEIS. FEIS IV–94; LRMP III–174–76. Water quality is likewise discussed in the Plan and FEIS. FEIS IV–99 (and sections cited therein). Plaintiff cites no statute or regulation which requires Defendants to include the above factors in the FORPLAN analysis. Plaintiff fails to establish that consideration of these resources elsewhere was a procedural or substantive error.

■■■ Plaintiff further contends that Defendants failed to estimate the Plan's compliance with the Clean Water Act, as required by § 219.23. That section provides:

Forest planning shall provide for—

(d) Compliance with requirements of the Clean Water Act, the Safe Drinking Water Act, and all substantive and procedural requirements of Federal, State, and local governmental bodies....

Our review of the record reveals that the Forest Service has not addressed this issue in the planning documents. The requirements of this regulation clearly state that the provisions of these Acts must be complied with. The planning documents do not plainly state that compliance has been achieved.

The Forest Service is DIRECTED to amend the Plan to plainly demonstrate compliance with the requirements of § 219.23.

### 7. Timber Sales

■■■ Plaintiff alleges that Defendants failed to conduct an economic feasibility analysis on each timber sale offered by the Rio Grande National Forest in violation of 16 U.S.C. § 1604(g)(3)(F)(ii). That section requires that regulations be promulgated which:

(F) Insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where—

(ii) the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area.

Plaintiff asserts that this section mandates an economic feasibility analysis on each timber sale. We disagree.

Section 1604(g)(3)(F)(ii) requires only that regulations be promulgated which insure that economic impacts on sale areas be carried out. The Secretary has complied by promulgating 36 C.F.R. § 219.27(A)(7):

(a) *Resource Protection.* All management prescriptions shall—

(7) Be assessed prior to project implementation for potential physical, biological, aesthetic, cultural, engineering, and economic impacts and for consistency with multiple uses planned for the general area.

Nothing in the enabling statute nor the implementing regulations requires that an economic feasibility analysis be carried out in the LRMP. The economic impact analysis may be performed any time prior to the implementation of the project. Plaintiff's

claim on this point is therefore DIS-MISSED.

### 8. Amending the Plan

Plaintiff claims that significant landslides and slope failures have occurred because of the implementation of the Plan. Plaintiff argues that these post-plan events require amendment of the Plan pursuant to 16 U.S.C. §§ 1604(f)(4) and (5). Plaintiff alleges that Defendants are under an obligation to amend the plan so as to re-evaluate the Forest's soils and the problems of soil instability. Defendants argue that such amendments are entirely up to the discretion of the Secretary, and in any event, must be presented to the Secretary before seeking judicial review.

Sections 1604(f)(4) and (5) provide:
Plans developed in accordance with this section shall—

> (4) be amended in any manner whatsoever after final adoption after public notice, and if such amendment would result in a significant change in such plan, in accordance with provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and (5) be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

The implementing regulations state:
> (f) Amendment. The Forest Supervisor *may* amend the forest plan. Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan. If the change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow the same procedure as that required for development and approval of a forest plan. If the change resulting from the amendment is determined not to be sig-

nificant for the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures.

36 C.F.R. § 219.10(f) (Emphasis added).

There is nothing in the enabling statute or the implementing regulations which requires the Forest Service to amend the Plan. We interpret the above regulation in conjunction with 36 C.F.R. § 219.11(k) which requires on-going monitoring and evaluation. The Rio Grande Plan provides for appropriate monitoring provisions. We must assume the good faith of the Forest Service in dealing with the changes revealed as part of the monitoring process.

 Further, Plaintiff asks us to substitute our judgment for that of the agency in deciding that the alleged landslides constitute a significant change requiring amendment of the Plan. The agency has not yet been presented an opportunity to decide whether significant post-plan events have occurred and whether those events would require an amendment to the Plan. In this instance, Plaintiff has not exhausted its administrative remedies. Plaintiff's proper remedy is to request a ruling on the post-plan events from the agency, who may then decide if the changes warrant an amendment to the Plan. Plaintiff may not circumvent established agency procedures and remedies by asking us to conduct a de novo hearing as to this issue.

### 9. Intervenors' Allegations

 Defendants argue that Intervenors' action is time-barred by the doctrine of laches, since NEPA and the NFMA do not set forth a statute of limitations. We disagree. The application of laches involves a discretionary decision of the district court. *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir.1982). An environmental action may be barred by the equitable defense of laches if (1) there has been unreasonable delay in bringing suit, and (2) the party asserting the defense has been prejudiced by the delay. *Id.* However, we agree with the principal that

"[l]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress' environmental policy." *Park County Resource Council v. U.S. Dept. of Agriculture,* 817 F.2d 609, 617 (10th Cir.1987).

We find neither unreasonable delay nor sufficient prejudice for the doctrine of laches to apply in the instant case. Intervenors' action was filed within a reasonable time after application of the regulations at issue in this case. The government has made no showing of prejudice in support of its position. We choose to follow the overriding policy expressed in *Park County* (supra) and hold that Intervenors' claims are not barred by the doctrine of laches.

■ Intervenors allege that Defendants have employed the following erroneous assumptions and constraints in their use of the FORPLAN I computer model: (1) outdated and biased timber price assumptions; and (2) timber price assumptions which contravened conventional economic practices and facts in the record. Defendants respond that Intervenor's claim should not be considered because it was not presented during the administrative process, and in any event, the constraints and assumptions utilized were reasonable.

Our review of the EIS reveals that Intervenors raised these issues in their comment letters during the notice and comment period. *See* EIS at VI–118, 119, 128, 160, 169, 172, 189, 190. Defendants offered responses to each of these comments. This is a sufficient presentation of issues at the administrative level to place them within the review jurisdiction of the court.

■ Intervenors claim that the Forest Service used outdated and inaccurate timber prices in arriving at the Plan. Defendants counter that their use of timber price data compiled from 1974–1978 was not un-

reasonable. We disagree. Section 219.-12(d) requires that:

Each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction. The Supervisor will assure that the interdisciplinary team has access to the best available data.

36 C.F.R. § 219.12(d). This section necessarily implies that not only shall the interdisciplinary team have access to the best available data, but that it consider the best available data.

Defendants center their defense on the assertion that later price information would have "relatively little impact on the outcome of the economic analysis." Defendants' Brief, p. 27. In order to make the statement that later price information would not have altered the outcome of the analysis, Defendants must have had access to such later information. *See* Declaration of Pamela Case, ¶¶ 32–36. Section 219.-12(d) requires that current information be considered in the planning process. Defendants have not sufficiently explained why more current price data was not used in the formulation of the Plan.

■ Intervenor's final claim in this area is that Defendants erred by using a horizontal demand curve in analyzing timber prices and related matters. Intervenors contend that Defendants employed a constant price of timber in the economic analysis regardless of the amount of timber which would be placed on the market. Intervenors claim that this is in violation of generally accepted economic theory which states that price fluctuates with supply. Defendants rely on an affidavit by James T. Powers which states that use of such a curve was reasonable under the circumstances.[25] We agree with Defendants that the use of such a demand curve is reasonable.

It is true that the general rule in economics is that price decreases with increasing

---

**25.** Powers states that the use of the flat demand curve was an adequate and reasonable methodology given the state of available research at the time of the stumpage analysis. Powers gives a detailed analysis of why a horizontal analysis is reasonable for such a study. (Powers Affidavit ¶¶ 8–13).

supply. However, the Powers Affidavit explains in highly technical terms that local timber markets depart from the general economic rule of increasing supply-decreasing price. Significantly, Defendants have considered a position contrary to that which they have taken, and have provided a reasonable explanation for their decision. In the absence of specific allegations and proof that such a conclusion is unreasonable, we will not substitute our judgment for that of the Agency and its expert.

Defendants are DIRECTED to review the planning documents and incorporate current timber price information into the formulation of the final Plan. Intervenor's claim that Defendants erred in utilizing a horizontal demand curve is DISMISSED.

## X. *The NEPA Claims*

Plaintiff alleges that the final EIS for the Rio Grande National Forest Plan is inadequate and deficient under NEPA for its failure to adequately analyze (1) the environmental impacts of timber harvesting on unstable soils and (2) the cumulative impacts of planned timber harvesting on the Rio Grande National Forest. Plaintiff contends that the Rio Grande final EIS does not contain a "full and fair" discussion of the environmental impacts of the Rio Grande Forest Plan as required by 40 C.F.R. § 1502.1, and failed to take a "hard look" at the environmental consequences of that proposed action.

We follow the standard of judicial review of an EIS as set forth in *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1376 (10th Cir.1980):

Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. § 4332(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas? *Sierra Club v. Stamm,* 507 F.2d 788 (10th Cir.1974) (citation omitted). Thus, in a real sense, an EIS is to be tested by the concepts of "good faith" and a "reasonable" discussion of

the five mandated areas of subject matter. Perfection is not the test ... Nor should the courts in evaluating an EIS engage in hindsight judgement by way of second guessing.

*See also, Save Our Valuable Land (Soil), Inc. v. Needham,* 542 F.2d 539 (10th Cir. 1976); *cert. denied,* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977).

■ The requirements of 42 U.S.C. § 4332 are mandatory in nature as they apply to procedure, but do not undertake to control decision making within the departments. *Jette v. Bergland,* 579 F.2d 59 (10th Cir.1978). The requirements of § 4332 are that all federal government agencies shall:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

The thrust of NEPA is that all pertinent environmental data be gathered in one place, i.e., the "statement", there constituting a discussion of all relative environmental impacts of a proposed course or alternative courses of action which reflects that the agency has given all pertinent environmental matters a "hard look" and has made a "good faith, objective, and reasonable presentation of the subject areas mandated by NEPA...." *Manygoats v. Kleppe,* 558 F.2d 556, 560 (10th Cir.1977).

■ The test which agencies must meet in dealing with environmental aspects of

the proposed action is tied to the "rule of reason" which may be stated as follows: If the environmental aspects of proposed actions are easily identifiable, they should be related in such detail that the consequences of the action are apparent. If, however, the effects cannot be readily ascertained and if the alternatives are deemed remote and only speculative possibilities, detailed discussion of environmental effects is not contemplated under NEPA. *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d at 1375. What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned. *Id.*

Our review in the instant case thus centers on whether the Forest Service has taken a "hard look" at the environmental consequences of the proposed ground disturbing activities. *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d at 1378. Plaintiff argues that the Rio Grande final EIS does not adequately analyze the environmental impacts of timber harvesting and roadbuilding on unstable soils. Defendants contend that their discussion of these environmental impacts is adequate.

The Final EIS discusses road construction as it relates to vegetation treatment. Final EIS, II–18. In its section on soil use and management, the EIS states that:

> "the objective of soil management on the Forest is to match management activities to the capability and suitability of the soil to assure long term productivity. This can be done quite precisely where the soil has been inventoried and soil characteristics are known. Through cooperation with the Soil Conservation Service and participation in the national cooperative soil survey, 363,722 acres on the Rio Grande National Forest have been inventoried. The entire Forest will be mapped by the end of FY 1987. On areas lacking soil inventories, site specific investigations of the soil resource are conducted before soil disturbing activities take place."

Final EIS, III–73.

■■■■■ We agree with the principal that the provision for on-going, site specific impact studies sufficiently complies with the requirements of NEPA. *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d at 1382. Where it appears that significant safeguards have been built into a plan to protect against those significant environmental impacts which cannot be identified or anticipated in the EIS, the mandates of NEPA are satisfied. *Id.*

In the instant case, provisions were made that no soil disturbing activities would be undertaken in areas not yet inventoried without a site specific soil survey. We find this provision to be within the parameters contemplated by the Tenth Circuit in *Environmental Defense Fund*. Plaintiff's argument that the Defendant's analysis of the soil characteristics was inadequate is misplaced and is rejected.

Plaintiff alleges that the Rio Grande Final EIS is deficient under NEPA because it fails to adequately analyze the cumulative impacts of the implementation of the Rio Grande National Forest Plan. Plaintiff claims that under 40 C.F.R. §§ 1502.16, 1508.25(c), 1508.7, and 1508.8, an EIS must contain a thorough discussion of the cumulative impacts anticipated from the proposed action. We disagree.

■■■ Our review of the regulatory scheme reveals that in determining the scope of an EIS, agencies must discuss cumulatively significant actions and impacts. 40 C.F.R. §§ 1508.25(a)(2) & (c). The determination of the scope of an EIS and the significant issues to be analyzed takes place during the "scoping" process. 40 C.F.R. § 1501.7. The "scoping" process takes place after the publishing of a notice of intent and before the issuing of the EIS. 40 C.F.R. § 1501.7(a)(2). There is no requirement that the EIS itself set forth a discussion of the scope of its inquiry, and hence, no requirement that it discuss cumulative impacts. In the absence of allegations to the contrary, we presume that an adequate discussion of cumulative impacts took place during the scoping process.

## XI. *The ESA Claim*

Plaintiff does not address this claim in either its summary judgment briefs or its

trial brief, nor did it refer to the claim at oral argument. In the Supplemental Pre-Trial Order, however, Plaintiff alleges Defendants failed to (1) provide direction for proposed timber management and road building which protects threatened and endangered species and (2) request the U.S. Fish and Wildlife Service ("FWS") for a list of endangered species possibly existing in individual timber sale areas.

Under the ESA, an agency proposing to take an action must inquire of the FWS whether any threatened or endangered species "may be present" in the area of the proposed action. 16 U.S.C. § 1536(c)(1). If endangered or threatened species are identified as a result of the first step, then the agency must prepare a "biological assessment" to determine whether such species "is likely to be affected" by the action. The ESA expressly provides that the biological assessment may be part of an environmental impact statement. Finally, only if the agency's biological assessment determines that a threatened or endangered species is likely to be affected by the agency's action, then the agency must formally consult with the FWS, and the FWS must issue a biological opinion. 16 U.S.C. § 1536(a)(2) and (b).

In the instant case, the Forest Service specifically identified endangered and threatened species in the action area (FEIS III–46), and then determined that the habitats of all such species would be "maintained through implementation of the Forest Plan." FEIS IV–60. The Forest Service consulted with the FWS in March of 1985, and the FWS concurred that the Forest Plan would not impact a listed species. FWS letter, Sept. 25, 1985. Plaintiff has provided no argument or evidence in support of its ESA claims. In the absence of such evidence, Plaintiff has failed to state a claim under the ESA. *See Mobil Oil Corp. v. ICC,* 685 F.2d 624, 640–41 (D.C.Cir.1982).

## XII. *Injunctive Relief*

■ Plaintiff–Intervenors seek an injunctive order enjoining Defendants from offering for sale more than 25 MMBF (million board feet) of commercial saw timber from the Rio Grande Forest. It is funda-mental that mandatory injunctive relief should be granted only under compelling circumstances. *Citizens Concerned, Etc. v. City & Cty. of Denver,* 628 F.2d 1289 (10th Cir.1980); *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). The issuance of an injunction is governed by traditional principles of equity. *Stringer v. U.S.,* 471 F.2d 381, 384 (5th Cir.1973); *cert. denied,* 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973). The granting or refusing of injunctive relief rests in the sound discretion of the court. *Goldammer v. Fay,* 326 F.2d 268 (10th Cir.1964).

■ The basis for injunctive relief is irreparable injury and the inadequacy of legal remedies. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1981) (citations omitted). The court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1986). Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent, or at least of long duration, i.e., irreparable. *Id.,* at 545, 107 S.Ct. at 1404. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. *Id.*

■ Based on the totality of the circumstances in this case, injunctive relief is appropriate. There is no sufficient legal remedy in this case and there is adequate evidence of land slides and other resource damage which suggests that the Forest has suffered, and will continue to suffer, irreparable harm.

The essence of equity jurisdiction is to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. *Hecht v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). We are not persuaded by Intervenor's argument that a reduction of the current timber harvest levels is required. However, the deficiencies in the Plan militate against permitting Defen-

dants to increase timber harvesting in the Forest at this time. Defendants are therefore ENJOINED from increasing timber harvesting levels in the Rio Grande Forest until compliance with this opinion and order is demonstrated.

### XIII. *Equal Access to Justice Act*

Plaintiff has moved this court for an award of costs and attorney's fees. Because the action involves the United States, we consider the request under the relevant portion of the Equal Access to Justice Act ("EAJA"):

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ..., incurred by that party in any civil action ... brought by or against the United States ..., unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). *See Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 2545, 101 L.Ed.2d 490 (1988).

A private party falling within the statute is entitled to an award unless the government meets its burden of proving substantial justification or injustice in the circumstances. *Kemp v. Bowen,* 822 F.2d 966, 967 (10th Cir.1986). The determination of whether the Government has met that burden lies in the sound discretion of the trial court. *Pierce,* 108 S.Ct. at 2546–49.

 The test for substantial justification is one of reasonableness both in law and in fact underlying the Government's position in the civil action and in the agency action out of which the litigation arises. *Kemp v. Bowen,* 822 F.2d 966, 967 (10th Cir.1987). Defendants' position in this action was a good faith effort to interpret an evolving area of natural resources/environmental law. Defendants prevailed on several of the issues and did not take a position which was unreasonable or in direct conflict with established precedent. We find Defendants' position in this case to be substantially justified. The request for costs and fees is DENIED.

### ORDER

The Motion for Summary Judgment filed by Plaintiff Citizens for Environmental Quality is GRANTED IN PART, and DENIED IN PART. The Motion for Summary Judgment filed by Plaintiff–Intervenors Colorado Environmental Coalition, Natural Resources Defense Council, the Wilderness Society, and the Audubon Society is GRANTED IN PART, and DENIED IN PART. The Motion for Summary Judgment filed by Defendants the United States of America, Richard A. Lyng, F. Dale Robertson, and Gary E. Cargill, is GRANTED IN PART, and DENIED IN PART.

ACCORDINGLY, judgment shall enter as follows:

1. In favor of Defendants and against Plaintiff on Plaintiff's claim that Defendants failed to properly designate lands with unstable soils as unsuitable for timber production as required by §§ 6(k) and 6(g)(3). However, Defendants are DIRECTED to identify the technology upon which they rely for the technology exception of 36 C.F.R. § 219.14(a)(2), and outline the provisions for its implementation.

2. Plaintiff's claim that Defendants failed to identify hazards to resources as required by 16 U.S.C. § 1604(g)(2)(C) is DISMISSED.

3. In favor of Plaintiff and Plaintiff–Intervenors and against Defendants on Plaintiff's and Intervenors' claim that Defendants failed to properly conduct an economic efficiency analysis as required by 36 C.F.R. § 219.14(b) and agency precedent. Defendants are DIRECTED to review the planning documents, and conduct a Stage 2 economic analysis as required by the Secretary's San Juan/Grand Mesa, Uncompahgre, and Gunnison National Forests decision and revise the Record of Decision accordingly. Defendants are DIRECTED to set forth a comprehensive explanation as to why an alternative with a significantly lower Present Net Value was selected as the Plan. Defendants are further DIRECTED to review their Plan in light of the Secretary's Decision Letter and the Ov-

erbay Memo to assure that economic factors are adequately discussed.

4. In favor of Defendants and against Plaintiff and Intervenors on Plaintiff's and Intervenors' claims that Defendants improperly relied upon timber production goals in determining the suitability of lands for timber production. However, Defendants are DIRECTED to review the planning documents and set forth the justification for allowing timber production goals to control the suitability analysis.

In favor of Defendants and against Plaintiff on Plaintiff's claim that the Plan is not cost efficient in violation of 36 C.F.R. § 219.14(c)(3).

5. In favor of Plaintiff and against Defendant on Plaintiff's claim that Defendants failed to formulate a broad range of management alternatives in violation of 36 C.F.R. § 219.12(f). Defendants are DIRECTED to review an alternative which is based on a profitable timber production program and set forth reasons for its selection or rejection. Defendants are further DIRECTED to fully and objectively consider all alternatives.

6. In favor of Plaintiff and against Defendants on Plaintiff's claim that the Plan fails to comply with 36 C.F.R. § 219.23(d), which requires compliance with the provisions of the Clean Water Act. Defendants are DIRECTED to amend the Plan to plainly demonstrate compliance with the requirements of § 219.23(d).

In favor of Defendants and against Plaintiff as to Plaintiff's claim that Defendants failed to consider visual resources and water quality in the formulation of the Plan as required by 36 C.F.R. §§ 219.12(g) and (h).

7. Plaintiff's claim that Defendants failed to conduct an economic feasibility analysis on individual timber sales is DISMISSED.

8. Plaintiff's claim that the Plan should be amended due to post-plan events is DISMISSED for failure to exhaust administrative remedies.

9. In favor of Intervenors and against Defendants on Intervenors' claim that Defendants employed outdated and inaccurate timber price data in arriving at the Plan. Defendants are DIRECTED to use current price data in the appropriate planning stages or provide an adequate explanation for the failure to use such data.

In favor of Defendants and against Intervenors on Intervenors' claim that Defendants erred in utilizing a horizontal demand curve in the analysis of timber prices and related matters.

10. In favor of Defendants and against Plaintiff on Plaintiff's claims that Defendants failed to consider environmental and cumulative impacts of timber harvesting on the Rio Grande National Forest as required by the National Environmental Protection Act.

11. The Plaintiff's claim under the Endangered Species Act is DISMISSED for failure to state a claim.

In all other particulars, the complaints and relief requested by Plaintiff and Intervenors are DENIED and are without merit.

Defendants are ENJOINED from increasing current timber harvest levels in the Rio Grande National Forest Plan until compliance with this order and opinion is demonstrated. The court retains jurisdiction only insofar as necessary to enforce compliance with this order.

The parties to bear their respective costs.