The SIERRA CLUB, et al., Plaintiffs,

v.

F. Dale ROBERTSON, et al., Defendants.

No. C2–92–249.

United States District Court, S.D. Ohio, E.D.

March 11, 1994.

Frederick M. Gittes, Spater, Gittes, Schulte & Kolman, Columbus, OH, for plaintiffs.

Edmund A. Sargus, Jr., United States Atty., and James E. Rattan, Asst. U.S. Atty.,

Columbus, OH, Wells D. Burgess, Louise F. Milkman, Edward Boling, Trial Attys., U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, for defendants; James A. Pfeil, Kathryn Tottenetti, Leslie M. Auriemmo, Office of the Gen. Counsel, Dept. of Agriculture, Washington, DC, of counsel.

## OPINION AND ORDER

GRAHAM, District Judge.

The Sierra Club and Citizens Council on Conservation and Environmental Control ("Citizens Council"), plaintiffs herein, filed this action against Mike Espy, Secretary of Agriculture, and officials of the United States Forest Service.

Plaintiffs challenge the Land and Resource Management Plan ("the Plan") for the Wayne National Forest ("the Wayne") and the Final Environmental Impact Statement ("FEIS") for the Plan, alleging violations of the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600–1614, the Multiple–Use Sustained Yield Act ("MUSYA"), 16 U.S.C. § 528 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* This action is brought under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* This matter is now before the Court on the parties' cross-motions for summary judgment.

## STANDARD OF REVIEW

Review of final agency action under NEPA and NFMA is governed by the APA, which directs a reviewing court to affirm final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The ultimate standard of review is a narrow one, and the court is not empowered to substitute its judgment for that of the agency, but instead it is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

While the agency's decisions are entitled to a presumption of regularity, that presumption does not shield them from a thorough, probing review. *Druid Hills Civic Ass'n v. Federal Highway Administration,* 772 F.2d 700, 714 (11th Cir.1985). In reviewing NEPA compliance, the role of the court is to ensure that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious. *Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir. 1992) (*quoting Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983)). Where a statute is ambiguous, review is limited to determining whether the agency's interpretation is based on a permissible construction of the statute, and does not extend to matters of policy. *Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation of its own regulations is binding on the court "unless it is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). Within the parameters of the applicable statutes and regulations, the management decision belongs to the agency, and should not be second-guessed by a court. *Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201, 210 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978).

## BACKGROUND

The Wayne National Forest is located in the unglaciated Appalachian Plateau of southeastern Ohio, commonly referred to as Ohio's Hill Country. It is bordered on the south by the Ohio River and includes three noncontiguous units located in the counties of Athens, Gallia, Hocking, Jackson, Lawrence, Monroe, Morgan, Perry, Scioto, Vinton and Washington. The gross area within the forest purchase units is 832,147 acres, of which 21% or 177,701 acres are now actually owned by the National Forest Service. There are many tracts of privately owned land intermingled with the Forest Service lands.

The management of the national forests is entrusted to the United States Department of Agriculture Forest Service. The NFMA requires the Forest Service to develop long-term plans for the management of national forests. Under NFMA and its regulations, the development of a forest management plan proceeds through a series of steps which ensure public involvement at each stage of the planning process. *See* 36 C.F.R. § 219.6, § 219.10, § 219.12. The first step is to identify the issues that the plan should address. Once that assessment is completed, several alternative management plans are constructed and each is subjected to an analysis of costs, benefits and environmental impacts, in accordance with NFMA and NEPA. After reviewing the environmental impacts and the cost benefit analysis, the Regional Forester for the administrative region in which the forest is located selects the alternative that in his opinion will "provide for multiple use and sustained yield of goods and services from the National Forest System in a way that maximizes long term net public benefits in an environmentally sound manner." 36 C.F.R. § 219.1(a). The approved plan controls all activity within the forest for a ten-year to fifteen-year period.

The planning process for the Wayne began in 1981 and continued over a period of five years. In August, 1986, the Forest Service published the proposed Plan together with a draft environmental impact statement ("DEIS") and distributed them to the public for comment. On January 4, 1988, after analyzing over 1,500 written comments, the Forest Service adopted the final Plan accompanied by a record of decision ("ROD") and the FEIS.

Both plaintiffs participated extensively in the initial planning process and in the comment period following publication of the proposed Plan and the DEIS. Both plaintiffs appealed the decision to adopt the Plan. The Chief of the Forest Service issued decisions on November 14, 1990 and January 14, 1992 denying plaintiffs' appeals. Plaintiffs filed this action on March 18, 1992.

### SELECTION OF SILVICULTURAL SYSTEMS AND TIMBER HARVEST METHODS

■ Under the Organic Act of 1897, a national forest may be established and administered only "to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. In 1960, Congress enacted the MUSYA, which directed the Secretary of Agriculture to develop and administer the resources of the national forests "for multiple use and sustained yield of the several products and services obtained therefrom" including "recreation, range, timber, watershed and wildlife and fish" with due consideration "to the relative values of the various resources" and in such a way that the "periodic output" of such resources be maintained "in perpetuity ... without impairment of the productivity of the land." 16 U.S.C. §§ 528, 529, 531. The principles of the MUSYA were expressly incorporated into the statutory and regulatory scheme of the NFMA. Under 16 U.S.C. § 1604(e)(1), the Secretary, in developing plans for the National Forest System, must assure that they

> provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple–Use Sustained–Yield Act of 1960 ... and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; ....

Inasmuch as one of plaintiffs' major objections to the Plan is its provision for timbering, it is appropriate to note that the harvesting of timber is and always has been one of the purposes of the National Forest System. The record of this case indicates that the harvesting of timber is also an important forest management tool.

Silviculture is that phase of forestry that deals with the establishment, development, reproduction and care of forest trees. Webster's Third New International Dictionary Unabridged, 1981. A silvicultural system is a management process whereby forests are tended, harvested, and replaced, resulting in a forest of distinctive form. 36 C.F.R. § 219.3. Systems are classified according to the method of carrying out the fellings that

remove the mature crop and provide for regeneration, and according to the type of forest thereby produced. *Id.* In managing forest lands, there are two systems available: even-aged and uneven-aged. Plan, Appendix, p. C–1. Even-aged management results in the creation of stands in which trees of essentially the same age grow together. DEIS, Appendix, p. E–7. Uneven-aged management seeks to maintain the growth of trees through a range of diameter or age classes. *Id.,* p. E–28.

Within the even-aged system, there are three recognized harvest methods: clearcutting, shelterwood and seed tree. Plan, Appendix, p. C–1. With even-aged harvest methods, the intent is to maintain a mosaic of different-aged stands of manageable size of equal age. *Id.,* p. C–3. The seed tree method involves harvesting all but a few well-distributed trees of the desired species to provide seed for natural regeneration. *Id.,* p. C–4. Later, the seed trees themselves are harvested. In the shelterwood method, all trees are removed in a series of two or three cuts with the final cut being made after a sufficient amount of desirable reproduction has become established. *Id.* This method provides a partial cover which may benefit the growth of seedlings. The clearcut method involves the cutting of all trees, merchantable and unmerchantable, at one time. Regeneration develops from natural seeding and sprouting. *Id.*

Within the uneven-aged system, the harvest method is selection, either single-tree or group selection. Plan, Appendix, p. C–1. Single-tree selection entails the periodic removal of individual trees. *Id.,* p. C–2. In the group selection method, group cuts, resembling small clear cuts, are made in a checkerboard pattern creating many small openings of one-half to two acres within the forest. *Id.,* p. C–3.

Each silvicultural system and its respective harvest methods have advantages and disadvantages.[1] The selection of the appropriate system and harvest method depends upon the judgment of the forest planner, taking into consideration the circumstances of the forest or subparts thereof, the goals of the forest plan and all applicable statutory and regulatory mandates. Clearcutting may be chosen as the method to regenerate an even-aged stand of timber only where it is the "optimum method," and other cuts may be used if "appropriate, to meet the objectives and requirements of the relevant land management plan." 16 U.S.C. § 1604(g)(3)(F). Timber harvests must be "carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation and esthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F)(v).

The Plan divides the Wayne into fifteen management areas, each of which has a management prescription. A management prescription consists of management practices selected and scheduled for application on a specific area to attain multiple use and other goals and objectives. 36 C.F.R. § 219.3. Each management prescription specifies the silvicultural systems and harvest methods to be applied.

■ The Plan provides for even-aged management on 80% of the suitable forest land and for uneven-aged management on the remaining 20%. ROD, p. 18. The Plan projects, but does not require, that over the course of a decade, 5,075 acres will be harvested under even-aged management and 2,760 acres will be harvested under uneven-aged management. Plan, p. 4–180. The predominant even-aged management harvest method is clearcutting. Plaintiffs argue that the Forest Service has illegally and arbitrarily adopted even-aged management as the routine method of vegetative management. They argue that the Plan fails to address the environmental impacts of clearcutting at specific locations and that it fails to address the requirement of optimality of clearcutting on a site-specific basis. They argue against clearcutting on the grounds that it has numerous detrimental environmental impacts, including the building of temporary roads and hauling logs which affect soils and plant life, and that

---

**1.** For discussion of pros and cons of even-aged versus uneven-aged management, *see* DEIS, pp. 4–16 to 4–32.

it changes water run-off, causes erosion and otherwise adversely impacts water resources and soil stability. They argue that the role of slopes and soil condition are critical to assessing the effects of clearcutting. They note that the forest is dominated by narrow ridges and valleys with slopes ranging from 15% to 80% and argue that the slopes and soil conditions present in the forest are not compatible with clearcutting. They object to the Plan's failure to address required mitigation techniques on a site-specific basis and attack as arbitrary the Plan's determination that slopes of 55% or higher are not accessible for purposes of logging.

A review of the Plan, the DEIS and the FEIS shows that all of these concerns were addressed by the Forest Service and that the applicable statutes and regulations provide for a further assessment of these concerns on a site-specific basis when the Forest Service proposes to pursue specific projects in the forest.

█ Plaintiffs contend that the Plan should specify in detail the proposed use of each and every acre of the forest. This is not required by the NFMA or NEPA, and in any event, it would be a practical impossibility in view of the fact that a general land use plan required over six years to complete.

█ The Plan is programmatic in nature. It does not propose any specific development. Implementation of the Plan occurs at a second stage when individual site-specific projects are proposed and assessed. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir.1992). The Forest Supervisor must ensure that all projects are consistent with the Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.11(e). Further NEPA analysis is required to evaluate the effects of a specific project and a range of alternative actions, including a "no action" alternative. 40 C.F.R. §§ 1502.14(d), 1508.9(b). In future environmental analyses, reference is made to the Plan, the FEIS and any subsequent environmental impact statements, a process known as "tiering." 40 C.F.R. § 1502.20. *See* Plan, p. 5–2. A detailed analysis of specific environmental impacts is not required when the agency has not yet proposed the specific project that may cause the im-

pacts. *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 891 (9th Cir. 1992).

The Plan addresses the effects of timber harvesting on soil and water resources, the problem of slopes and roads and erosion mitigation techniques.

> Although not conducted specifically on the Wayne National Forest, research has repeatedly shown the effect of clearcutting on soil and water quality is normally within fully acceptable limits and may be less than would be associated with other methods of harvesting. The major potential for soil damage would be caused by improperly located log landings and logging roads. With appropriate mitigating measures as described in the standards and guidelines of the Forest Plan, pages 4–28 to 4–38, this will not be a major problem. Harvesting with well-planned, well-constructed, and well-maintained road systems will minimize soil erosion and channeling effect and will cause no real damage to water resources (Kochenderfer and Aubertin, 1975).

FEIS, p. 2–17. *See also* DEIS, pp. 3–2 to 3–3, 4–3 to 4–4, 4–49 to 4–50; DEIS, Appendix, p. B3–9. Plaintiffs have not shown that these general determinations are arbitrary or capricious. A more specific consideration of these matters is properly deferred until there is a proposal of a specific timber sale at a specific site.

The Plan provides for procedures to mitigate and prevent erosion and water pollution. *See* Plan, pp. 4–28 to 4–35. *See also* FEIS, p. 2–15 (discussing erosion and clearcutting). Plaintiffs criticize the Plan for not specifying when or at what specific location mitigation techniques are to be used and for failing to discuss the cost of mitigation techniques. However, the Plan contemplates that mitigation techniques will be addressed at the time of specific timber sales and that the costs of such techniques will be borne by the purchasers and enforced by the contract of sale. FEIS, p. 2–18. Thus, if the cost of mitigation renders a sale unprofitable presumably it will not occur and there is no need to address such costs in the Plan.

With regard to the selection of even-aged management and clearcutting as a harvest method, 16 U.S.C. § 1604(g)(3)(F)(i) requires the Secretary to promulgate regulations for the development of land management plans which must include guidelines which

> insure that clearcutting, seed tree cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where—(i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan; ....

Pursuant to this statutory mandate, the Secretary has promulgated 36 C.F.R. § 219.-27(b)(1), which requires that management prescriptions in a forest plan that include vegetative manipulation of tree cover for any purpose shall

> (1) Be best suited to the multiple-use goals established for the area with potential environmental, biological cultural resource, aesthetic, engineering, and economic impacts, as stated in the regional guides and forest plans, being considered in this determination; ....

As applied to clearcutting, the regulation requires that it be best suited to meet the requirements and objectives of the Plan. "Best suited" is synonymous with "optimal." Thus, the rule is consistent with the statute.

The Plan for the Wayne complies with the statute and the rule. In those management prescriptions which include clearcutting, there is a determination that clearcutting is the optimum method to meet the objectives and requirements of the Plan and the rationale for that determination is explained. *See* Plan, Appendix C. This determination will substantially affect future decisions and is ripe for review. *Mumma*, 956 F.2d at 1508. The reasons given for choosing clearcutting include the following:

> To obtain desirable natural regeneration in central hardwood stands, clearcutting is the most effective method. Clearcutting normally results in more seedlings and new sprouts than any other harvest method. Where regeneration of oak and hicko-

ry is of primary importance, advance reproduction of these species is essential prior to harvesting the overstory. (Sander and Clark, 1971) Experience has also shown that other factors such as site quality, aspect and slope position affect the composition of natural regeneration. The oaks and hickories compete better on poor, dry sites with south and west exposure.

Clearcutting is especially appropriate for stands where the residual trees would not be worth retaining for a future crop, when stands have had the best trees removed in past harvests, or in areas which have insufficient trees to adequately use growing space.

\*　　\*　　\*　　\*　　\*　　\*

To maintain the present diversity of tree and animal species and high quality hardwoods on a sustained yield basis, it is necessary to use an even-aged system. The only methods applicable to the Forest are shelterwood and clearcut.

The Eastern white pine plantations will be regenerated by the shelterwood method and will result in mixed pine-hardwood stands.

Clearcutting is optimum to regenerate the yellow poplar type because it is the only method which provides sufficient light to achieve adequate stocking and growth of yellow poplar.

The clearcut and shelterwood methods are both appropriate for the oak-hickory type. In stands where the desired condition is the forest type and advance regeneration is not present in adequate numbers, shelterwood may be used in an attempt to increase the amount of desired advance regeneration. The use of shelterwood will probably be in conjunction with prescribed fire, understory control of undesired species, underplanting of oaks, or a combination of all these practices. Stands with a poorly stocked overstory or of low vigor are not shelterwood opportunities. These stands will be regenerated by clearcutting to retain oak and hickory as stand components.

Where oak-hickory regeneration is not a problem, clearcutting is optimum because: [7 specific reasons are given]

In summary, where oak-hickory reproduction is not a problem, clearcutting is optimum. It offers more flexibility of location to manage timber for other purposes, higher revenues, lower costs, and less risk. In nearly all cases, clearcutting will regenerate as much, or more, oak than uneven-aged management by the group-selection method and more than would be regenerated using [a] single-tree selection method of management.

Plan, Appendix, pp. C–4 to C–7.

The FEIS further explains the rationale for choosing clearcutting in response to specific objections to the Plan's proposed vegetative management prescriptions. *See* FEIS, pp. 2–15 to 2–18 and 2–23.

Many people believe that the long-term effects of clearcutting have not been adequately assessed. However, this harvesting method does, in fact, imitate nature. Natural clearcutting occurs as a result of wildfire, wind, insects and disease. We have had the opportunity to observe how Forests which succumb to these natural forces return to production. Knowledge gained from the exploitive land clearings a century ago and examining our current Forests, even-aged Forest, help us to understand the silvicultural benefits of clearcutting. Combined with the knowledge that many species of trees will not grow and reproduce well in uneven-aged Forests, this reassures us in our belief that even-aged management is the most appropriate on much of the Wayne National Forest.

FEIS, p. 2–18.

The FEIS also notes, at p. 2–23:

Clearcutting is as much a sustained yield system as selection cutting, and results in areas which regenerate naturally, grow rapidly, and help ensure healthy future forests.

Areas harvested by clearcutting regenerate rapidly and within 8 to 10 years are filled with regeneration 20 to 30 feet tall. By the time they are 20 years old, most people do not realize that they were even clearcut. At any time, the amount of the Forest with an "open canopy" from clearcutting will be less than 10 percent even in Management Areas 3.1 and 3.2. The open area greatly increases the capacity of the Forest to support some species of wildlife.

Plaintiffs' characterization of the consequences of even-aged management as producing monocultural "tree farms" is not supported by the record. The Plan indicates that regeneration after even-aged timber harvesting will be by natural means, not artificial planting. Plan, Appendix, p. C–4. Natural re-seeding will provide a diverse mixture of trees just as would occur after a forest fire or windstorm.

On the other hand, a plan which allowed no vegetative management would result in its own form of monoculture: a dark high-canopy forest in which only shade tolerant species can survive and in which valuable hardwood timber rots on the stump or on the ground. *See* Plan, Appendix, p. C–2; FEIS, p. 2–23; DEIS, p. 4–27.

The Plan limits clear cuts to a maximum size of 30 acres in management areas 3.1 and 3.2, 20 acres in management area 3.3 and 15 acres in management area 6.1. ROD, p. 17. The Plan incorporates standards and guidelines to lessen the visual impact of clearcutting, including the shape and location of openings, the retention of important vegetative features, road location and design and disposal of logging debris. ROD, p. 18. The Secretary's regulations require that when openings are created by the application of even-aged management, they "shall be shaped and blended with the natural terrain, to the extent practicable, to achieve aesthetic, wildlife habitat, or other objectives established in the plan." 36 C.F.R. § 219.27(d)(1). In response to public comments the number of acres proposed for even-aged management was reduced by 8,375 acres. ROD, p. 18.

Plaintiffs have failed to show that the choices of uneven-aged management as the predominate silvicultural system and of clearcutting as the predominate harvest method were arbitrary or unreasonable. In enacting 16 U.S.C. § 1604(g), Congress considered the arguments for and against clear-

cutting in the National Forests and struck a delicate balance between two extremes. It chose not to prohibit clearcutting but to regulate it, leaving the technical management responsibility for the application of the NFMA guidelines on the Forest Service. "Within its parameters the management decision belongs to the agency and should not be second-guessed by a court." *Bergland,* 473 F.2d at 210.

The Plan determines that in certain management areas, clearcutting is the optimum harvest method to meet its objectives and requirements, but recognizes that there may be specific sites within those areas where clearcutting would not be appropriate. This would include sites where the slope or soil conditions are not conducive to clearcutting, or sites where soil or exposure is not conducive to oak-hickory regeneration. These matters, as well as the specific environmental impacts of a specific timbering project, will be addressed on a site-specific basis at the time of a proposed timber sale. While the Plan narrows the scope of future environmental analyses, an environmental analysis will be completed for each project which will focus on site-specific issues, alternatives and environmental consequences unique to the project. Plan, p. 5–2.

In ruling on the administrative appeal of the Sierra Club, the Chief of the Forest Service explained the relationship between the optimality determination contained in the Plan and site-specific issues which will be addressed on a project-by-project basis:

> The optimality determination in the Wayne Forest Plan is appropriate as programmatic guidance that clearcutting is likely to be the preferred method of timber harvest in certain areas of the forest to achieve specific management objectives. However the analysis and final decision on the appropriateness of even-aged management, or the optimality of clearcutting, must be made as a site-specific determination at the project level during Forest Plan implementation

2. Federal Register, Vol. 57, No. 182, § 31.2.

3. After oral argument on the cross-motions for summary judgment, counsel for defendants filed a copy of the April 8, 1991 ROD for the Land and

and must follow National Environmental Policy Act procedures.

Decision Letter, Appeal No. 2309, Docket No. 2, Nov. 14, 1990, p. 6.

Plaintiffs argue that under recently adopted Forest Service NEPA regulations, some timber sales will escape further review.[2] The regulation in question applies to timber sales of 250,000 board feet or less and is premised on the agency's judgment that sales in such small amounts would have no significant environmental impact. The validity of the regulation is not an issue before the Court. Although such sales are categorically exempted from environmental analysis when the Forest Service determines that no extraordinary circumstances exist, the decision to proceed must be documented and interested and affected persons must be notified and they have the right to appeal. 36 C.F.R. § 217.3. The court is not persuaded that this regulation renders any determination made in the Plan unreasonable or arbitrary.

Plaintiffs argue that there is no justification to allow any significant timbering on the Wayne and support this argument in part with the assertion that "for some years timbering has been almost entirely forbidden in the Hoosier National Forest" which until recently was jointly administered with the Wayne. Plaintiffs' Revised Motion for Summary Judgment, p. 24. There is nothing in the record to support this assertion.[3] The Hoosier National Forest is 250 miles from the Wayne in another state, and there is nothing in the record of this case which would support an argument that decisions reached there would be relevant to this Court's consideration of the Plan for the Wayne. To exclude timbering in favor of other uses would be a violation of the MUS-YA and would deprive the Forest Service a valuable forest management device.

## ALLOCATION OF LANDS THAT ARE UNSUITABLE FOR TIMBER PRODUCTION

Title 16, U.S.C. § 1604(k) provides in part as follows:

> Resource Management Plan Amendment for the Hoosier National Forest which provides for a timber harvest of up to 4.4 million board feet per year.

In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, . . .

Lands so identified are generally exempt from timber harvesting for a period of ten years. *Id.*

Plaintiffs claim that the Forest Service failed to designate sufficient physically unsuitable land, failed to adequately assess the availability, cost and effectiveness of mitigation measures necessary to prevent irreversible damage and failed to adequately analyze the impacts of the Plan on water resources.

In order to implement the mandate of 16 U.S.C. § 1604(k), the Secretary adopted 36 C.F.R. § 3219.14, which provides the criteria for identifying lands which are not suited for timber production. The criteria for physical unsuitability are: (1) the land is not forest land[4]; (2) technology is not available to ensure timber production from the land without irreversible resource damage to soil productivity or watershed conditions; (3) there is not reasonable assurance that such lands can be adequately restocked; and (4) the land has been withdrawn from timber production by an act of Congress, the Secretary of Agriculture, or the Chief of the Forest Service. 36 C.F.R. § 219.14(a)(1)–(4).

The forest planners found that available technology could ensure timber ·production on 169,215 acres of the Wayne without irreversible resource damage to soils productivity, or watershed conditions. Plan, p. 4–7; DEIS Appendix, pp. B3–B37. The Plan contemplates that the effects of timber harvesting will be controlled by the design of timber sale areas using standards and guidelines that will adequately protect these resources. *See* Plan, pp. 4–28 to 4–38 and Appendix F; FEIS, p. 2–17. The Plan identifies the technology to be used in preventing irreversible damage and provides for its implementation.

*See Citizens for Environmental Quality v. United States,* 731 F.Supp. 970, 985 (D.Colo. 1989). The Plan's standards and guidelines generally limit roads to slopes no greater than 35%, provide soil sensitivity standards for various logging activities, and require watershed protection measures such as filter strips in which no earth-disturbing activities will occur unless special techniques are used to minimize potential detrimental effects. *Id.* As noted above, a separate environmental analysis will be conducted at the time of any proposed timber sale. The forest planners concluded that available techniques would control soil and watershed impacts from timber harvesting to the point of insignificance. DEIS, p. 4–3, Table 4–1. Plaintiffs have not shown that this determination was arbitrary or capricious.

The Court rejects the plaintiffs' claim that the forest planners were required to estimate the cost of available technology in order to determine if it is "available" within the meaning of 36 C.F.R. § 219.14(a)(2). Plaintiffs' reliance on *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) is misplaced. *Robertson* involved a special use permit authorizing the development of a major ski resort in the Okanogan National Forest, not a programmatic plan for the entire forest. The cost of mitigation measures is site-specific. The cost of mitigation measures is borne by the purchaser. FEIS, p. 2–18. If the cost of required mitigation measures at any specific site renders the timber sale unprofitable, then it is safe to assume that it will not occur. The Forest Service's interpretation of 36 C.F.R. § 219.14(a)(2) is not plainly erroneous or inconsistent with the regulation. *Larionoff,* 431 U.S. at 872, 97 S.Ct. at 2155.

Plaintiffs claim that the record "is totally lacking in any meaningful or adequate analysis of water quality related issues." Plaintiffs' Revised Motion For Summary Judgment. However, as noted earlier, the forest planners did consider the impact of timber

---

4. Forest land is defined generally as land which is at least 10% occupied by forest trees. *See* 36 C.F.R. § 219.3.

**496**

harvesting on watershed quality and concluded that it would not cause irreversible resource damage. The Plan includes forest-wide guidelines and procedures for the protection of water and soil resources. *See* Plan, Chapter 4. The DEIS describes the quality of the surface water in the forest and the types of pollutants that impact those waters. DEIS, p. 3–10. The DEIS also recognizes that water quality may be affected by timber harvesting and the development of recreation facilities, structures and roads. DEIS, p. 4–86. The Plan provides for the monitoring and evaluation of these management activities. Plan, p. 5–3. This level of documentation is adequate for a programmatic forest plan. Plaintiffs have asked the Court to revisit its ruling on the need for detailed information on such site-specific developments as the construction of a sewage treatment facility. *See* Memorandum Opinion and Order, March 8, 1993, p. 14. The Court will adhere to the position taken in its earlier order for the reasons stated therein. When a programmatic EIS is prepared, "site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development." *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982). *See also Lujan*, 961 F.2d at 890–891.

Plaintiffs claim that in authorizing below-cost timber sales defendants have violated the economic suitability requirement of § 1604(k). They claim that defendants improperly allowed timber harvest levels to determine whether land was included in the suitable timber base. They argue that § 1604(k) requires that economically unsuitable land be identified and removed from the timber production base prior to the selection of harvest levels, and they assert that the Secretary's regulations on economic suitability are in conflict with § 1604(k).

■ Section 1604(k) does not impose a strict economic test for the suitability of timbering. The statute requires forest plans to identify lands which are not suitable for timber production considering economic "and other pertinent factors to the extent feasible, as determined by the Secretary." Section 1604(k) does not identify the specific economic factors to be considered in determining

which lands are not suited for timber production but leaves that to the determination of the Secretary. While § 1604(k) makes it clear that Congress intended economic factors to be a consideration in determining whether land is suitable for timber production, it is likewise clear that Congress did not require that economic factors alone should be determinative. The statute vests the Secretary with broad discretion to consider a variety of possibly conflicting factors in determining whether an area is suitable for timber production. Congress allowed the agency to choose its own method for balancing physical, economic and other considerations in determining the suitability of lands for timber production. Acting pursuant to this broad grant of discretion, the Secretary adopted criteria for economic unsuitability in 36 C.F.R. § 219.14.

Pursuant to 16 U.S.C. § 1604(h), the Secretary was required to appoint a committee of scientists to provide advice and counsel on the guidelines and procedures for land management plans. The committee concluded that § 1604(k) did not require timber sales to meet specific economic criteria, but implied congressional concern that timber harvesting should not take place where "by some rule of reason public benefits were less than production costs." 44 Fed.Reg. 26,630 (1979). The committee recommended cost benefit criteria to be applied before the development of plan alternatives. The Secretary adopted the committee's cost-benefit criteria, but chose to apply them as part of the planning process outlined in 36 C.F.R. § 219.14.

The regulation provides a two-stage analysis for economic suitability. The first stage, contained in 36 C.F.R. § 219.14(b), determines the financial costs and economic benefits of a proposed management prescription. The second stage is a flexible analysis which estimates the indeterminate values of non-economic benefits such as aesthetics and recreation. The goal of the two-stage analysis is to exclude lands for timber production if they are not "cost-efficient" in meeting the overall plan objectives. "Cost efficiency" includes consideration of both monetary and non-monetary costs and benefits. Under 36 C.F.R. § 219.14(c)(3), lands must be tenta-

tively identified as not appropriate for timber production where the "lands are not cost-efficient, over the planning horizon, in meeting forest objectives, which include timber production."

■■■■■ Plaintiffs' argument that the statute precludes consideration of production goals as part of this determination is not well founded. *See Citizens For Environmental Quality*, 731 F.Supp. at 988. Plaintiffs' argument that the determination of economic suitability must occur before the development of plan alternatives likewise fails. It is within the Secretary's discretion to apply the economic suitability test at the planning stage.

■■■■■ The interpretation put on a statute by the agency charged with administering it is entitled to deference. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981). A court should follow the construction of a statute by those charged with its execution unless there are compelling indications that it is wrong. *Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202, 206 (6th Cir.1991), *quoting Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

The forest planners determined that the total net forest area was 176,787 acres. Of that area, 169,215 acres were determined to be physically suitable for timber production. After applying the cost-efficiency analysis, another 43,108 acres were removed from the timber base leaving 126,107 acres as suitable for timber production. This is about 75% of the total net forest area. ROD, p. 19. This was a reduction from the previous plan which had identified 166,000 acres as suitable. ROD, pp. 18–19. The forest planners determined that the maximum allowable sale quantity (ASQ) would be 7.5 million board feet ("MMBF") per year, a reduction from 9.7 MMBF in the previous Plan. *Id.* The ASQ does not determine the actual amount of timber which will be sold but sets the upper limit for the plan period. The actual amount of timber sales may be less and will depend on several unpredictable factors, including the budget of the Forest Service, the market

for wood products and other conditions which may limit the practicality of offering sales at levels developed in the Plan. Decision Letter, Appeal No. 2813, Docket No. 2, January 14, 1992, p. 9 (hereinafter "Citizens Council Appeal Decision"). *See* ROD, pp. 18–19. The ASQ of 7.5 MMBF is well below the estimated long-term sustained yield capacity of the forest and is only 40% of current timber industry demand. *Id.*, ROD, p. 19. The Plan has a lower level of timber harvest than some of the alternatives considered. *Id.* There is no evidence that the forest planners gave undue weight to timber production goals in the suitability analysis or that they capitulated to timber industry interests.

The justification for below-cost sales is set forth in the ROD, p. 20–21, as follows:

> To accomplish the Plan's goals and the Forest's desired future condition requires treatment of the vegetation. Commercial timber harvest has traditionally been the preferred method to manage vegetation through applied silviculture. Timber harvest is viewed as the most technically sound and least costly method of vegetative management.

> \* \* \* \* \* \*

> [T]he overall timber sale program is expected to provide a positive cash revenue to the Forest. The cash revenue of below cost sales are less than the cost to the U.S. in preparing and administering the sales, plus the cost of road construction and reconstruction and reforestation. However, this approach to accounting was not used in the analysis of alternatives. The cost versus revenue approach ignores a fundamental principle that must be taken into account in evaluating the economics of the Forest Service's timber sale program. The Forest Service is required by law to manage the National Forests for multiple use. The real measure of the worth of the timber program is not costs versus revenues, but costs versus public benefits. This is the approach that was utilized in our analysis. Public benefits can be measured as receipts and as the dollar value of benefits for which revenues are not re-

ceived, such as recreation. Unfortunately, some benefits are impossible to value in dollar terms or other readily quantifiable measures.

The treatment of vegetation through timber sales complements other uses of the Forest. For example, timber sales are often an effective means of improving or maintaining the visual quality on the Forest.... Improved visual quality contributes to high quality dispersed recreation use in the long run. By providing for a variety of tree species, age and size in timber stands, the Forest Service can achieve and maintain a forest less susceptible to insects and disease.

A variety of wildlife habitats are provided by a diversity of timber stand age classes and tree species. Timber sales are the most economically viable means of achieving desired plant and animal diversity. Our publics put high values on wildlife-associated recreation and the visual amenities of the Forest. If these benefits were provided through a method other than commercial timber sales, costs would be significantly higher and would eliminate returns to the Treasury. If the visual, wildlife, and recreation benefits were added to the returns to the Treasury, timber sale benefits would substantially exceed the costs.

See also DEIS, pp. 2–77 through 2–87. Plaintiffs have not shown that the cost benefit analysis supporting the planned timber sales in the Wayne was arbitrary or capricious.

Plaintiffs have made reference to the July 31, 1985 decision of Douglas W. MacCleery, Deputy Assistant Secretary of Agriculture, in the matter of the review of the administrative decision of the Chief of the Forest Service related to the administrative appeals of the Forest Plan and Environmental Impact Statements for the San Juan National Forest and the Grand Mesa, Uncompahgre, and Gunnison National Forests ("San Juan/ GMUG").[5] The MacCleery decision found that the planning documents provided inadequate information on the economic implications of continuing and increasing a timber

sales program where costs substantially exceed revenues. In rejecting the plaintiffs' administrative appeals in the instant case, the Chief of the Forest Service found that the MacCleery decision did not apply to the Wayne because the Plan does not increase but decreases the timbering program. He also found that the planning documents for the Wayne did address many of the economic factors noted in the MacCleery decision. Citizens Council Appeal Decision, p. 7. The Court further notes that the MacCleery decision was based at least in part on concerns about the fact that the San Juan/GMUG plan reduced economic efficiency. Here, while the present net value of the Plan is 10% less than the former Plan, the decrease is attributed not to timber harvesting but to increases in semi-primitive recreation areas and uneven-aged management, which plaintiffs advocate. See DEIS, p. 2–97. It appears that the Chief of the Forest Service reasonably interpreted the MacCleery decision and his interpretation of the agency's prior ruling is entitled to deference. Furthermore, the Regional Forester has sufficiently explained why the Plan maximizes net public benefits even though it includes below-cost timber sales.

Plaintiffs claim that the forest planners allowed the fifth decade harvest level to dictate the timber base and that this violates the Secretary's suitability regulation. The Plan, Table 4–1, indicates that the fifth decade timber harvest level is a projection based on the increasing maturity of the forest over the next fifty years. See FEIS, p. 2–21. It is not apparent to the Court that this projected output controlled the planners' determination of the suitable timber base. Even if it did, the Court is not convinced that this would be arbitrary or capricious or contrary to the statutes or the regulations. The amount of suitable timber base does not represent the amount of timber which will be harvested. As noted above, the amount of timber that can be harvested is limited by the ASQ and the actual amount harvested will be determined by budgets, market factors and other conditions. See infra, p. 24. If the suitable timber base exceeds the amount required to meet the timber produc-

5. Sometimes referred to variously as the "MacC- leery decision" or the "San Juan decision."

tion goals of the Plan, that appears to be of little consequence except to give the Forest Service greater latitude in determining just where in the forest the timber harvests will occur. This approach seems consistent with the use of timber harvesting as a forest management tool.

### CONSIDERATION OF A BROAD SET OF ALTERNATIVES

Plaintiffs argue that the alternatives proposed in the planning process did not present a broad set of alternatives for consideration and review as required by the applicable statutes and regulations. Plaintiffs specifically allege that the alternatives proposed did not present a sufficiently broad set of alternatives for the range of timber base, length of rotational period of timber harvests and the provision of semi-primitive recreation. None of these arguments were raised in plaintiffs' administrative appeal. The only objection raised there regarding an insufficient range of alternatives related to the forest road system. *See* Citizens Council Statement of Reasons, pp. 40–43; Citizens Council Appeal Decision, pp. 11, 12. Claims based upon issues which have not been addressed in the administrative appeal are barred. *Cisternas–Estay v. Immigration and Naturalization Service*, 531 F.2d 155 (3d Cir.1976); *Getty Oil Co. v. Clark*, 614 F.Supp. 904, 921 (D.Wyo.1985) (court may not consider contentions that were not presented in the administrative proceeding below). However, in the interest of judicial economy, the Court will nevertheless address the merits of these newly raised arguments.

Alternatives prepared for consideration in an Environmental Impact Statement ("EIS") are intended to provide a broad range of reasonable management scenarios for the various uses of the forest. *See* 36 C.F.R. § 219.12(f). "The primary goal in formulating alternatives, besides complying with NEPA procedures, is to provide an adequate basis for identifying the alternative that comes nearest to maximizing net public benefits, consistent with the resource integration and management requirements" of the NFMA regulations. *Id.* The purpose of a forest plan and supporting EIS is to develop overall guidance for management of all multi-

ple-use resources. *Citizens for Environmental Quality*, 731 F.Supp. at 977. The alternatives are not intended to focus on specific outputs such as timber production or a specific form of recreation; instead, they are intended to "provide different ways to address and respond to the major public issues, management concerns, and resource opportunities identified during the planning process." 36 C.F.R. § 219.12(f)(4). Seven alternative plans were considered. They are described in general in the DEIS as follows:

> Seven alternatives for development of a Land and Resource Management Plan for the Wayne National Forest in Ohio are described and evaluated in this Draft Environmental Impact Statement (DEIS). The alternatives respond to public issues and management concerns and provide for different levels of goods, services, and uses. The alternatives are: (1) continuation of current management; (2) emphasis on economic efficiency; (3) emphasis on a wide variety of vegetative conditions and recreation opportunities; (4) emphasis on uneven-aged silviculture; (5) emphasis on a balanced mix of even-aged and uneven-aged silviculture, early and late successional habitat, and recreational opportunities; (6) emphasis on early successional wildlife habitat and off-road vehicle use; and (7) emphasis on a low intensity of management.

DEIS, p. i.

The DEIS identified eleven major public benefits which were varied to provide a wide range of benefits. DEIS, p. 2–14. Other benefits that were not considered to be major issues were also varied. *Id.* The alternatives are described and compared in the DEIS. DEIS, pp. 2–20 to 2–62. In alternative 1, 97% of the forest is allocated to even-aged management with a mixture of 80–year and 120–year rotation. Alternative 2 assigns 97% of the forest to even-aged management with a 120–year rotation. In the case of alternative 3, which became the Plan, 18% of the forest is allocated to uneven-aged management, 30% is allocated to even-aged management with an 80–year rotation, 33% is allocated to even-aged management with a 120–year rotation and 15% is allocated to

semi-primitive recreation with a mixture of even-aged management with a 120–year or 160–year rotation and natural forest with no timber harvest. In alternative 4, 93% of the forest is allocated to uneven-aged management. Alternative 5 allocates 42% of the forest to uneven-aged management, 40% to even-aged management with an 80–year rotation, and 25% to semi-primitive, non-motorized recreation with a mixture of even-aged management with a 120–year rotation and natural forest with no timber harvest. Alternative 6 assigns 72% of the forest to uneven-aged management with an 80–year rotation, and 25% to even-aged management. Alternative 7 is a low intensity management option with a timber base of only 15,588 acres, in which 75% of the forest is assigned to even-aged management and 22% is assigned to semi-primitive non-motorized recreation with a mixture of even-aged management with a 120–year rotation and natural forest with no timber harvest. The amount of land classified as suitable timber land ranges from 17,878 acres in alternative 7 to 147,742 acres in alternative 6. DEIS, Appendix B, Table B3–9.

NEPA requires that the EIS set forth only those alternatives sufficient to permit a reasoned choice. *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). NEPA does not require an agency to consider alternatives that do not achieve the purpose of the proposed action. Thus, the focus of the Court's inquiry is whether the agency adequately considered alternatives "reasonably related to the purposes of the project." *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 593 (9th Cir.1988). The Court concludes that the alternatives described in the DEIS provide an adequate basis for identifying the alternative that comes nearest to maximizing public benefits, as required by NFMA regulations. The Court concludes that the Forest Service

considered a reasonable range of alternatives as required by NEPA.

## USE OF THE FORPLAN COMPUTER MODEL

 Plaintiffs criticize the manner in which the forest planners used FORPLAN, a computer program designed for use in forest planning. The Court has reviewed plaintiffs' arguments regarding the use of FORPLAN but finds no support in the record for the conclusion that it resulted in any decisions which were arbitrary or unreasonable. Plaintiffs contend that arbitrary and capricious assumptions regarding the recreation values of timbering were input into the FORPLAN model which caused the program to assume that timbering was necessary for recreation. They assert that this error can be demonstrated by studying the FORPLAN computer run of "Max PNV[6] market" and "Max PNV assigned." Plaintiffs dispute the forest planners' assumptions about recreation values, claiming that they overestimate the benefits to recreation from timbering. The DEIS indicates that recreation values used in the planning process were based upon the 1980 RPA National Assessment, a document compiled by the Secretary of Agriculture every ten years, which contains facts and analyses to develop and guide public and private forest and rangeland policies and programs. *See* DEIS, Appendix, p. B4–13 and Glossary. Recreation values developed at the regional level for the 1980 RPA Assessment were used to estimate the wildlife and recreation values used in the FORPLAN model. DEIS, Appendix, p. B4–13 and Table B4–6. There is nothing in the record to support plaintiffs' argument that these values are arbitrary and capricious. There is no evidence that they are based on inadequate research and analysis, or that their validity is otherwise undermined.

Plaintiffs object to the planners' failure to consider the greater value of semi-primitive non-motorized recreation in the Wayne because of the limited opportunity for such

---

**6.** PNV or present net value is the difference between the dollar value of outputs resulting from management activities and the costs of those management activities, discounted to present value. *See* 36 C.F.R. § 219.3. NFMA regulations require the Forest Service to compute economic benchmarks for the PNV of outputs that have an established market price ("market PNV") such as timber and developed recreation and the PNV of outputs with an assigned market price (assigned PNV) such as dispersed recreation. 36 C.F.R. § 219.12(e)(*l*)(iii).

recreation in southeastern Ohio. However, the planners recognized that semi-primitive recreation in the Wayne should be valued higher than indicated in National Willingness to Pay studies and included the difference in the category of non-priced benefits. *See* DEIS, Appendix, p. B4–17.

### DIVERSITY

 Plaintiffs argue that the Plan fails to provide for diversity of plant and animal communities as required by the NFMA and its regulations. They argue that clearcutting threatens wildlife diversity, and that proper consideration of diversity of plant and animal communities requires preservation of old growth and mature forest areas as opposed to early successional conditions which occur under even-aged management. Under ·16 U.S.C. § 1604(g)(3)(B), the regulations for land use plans must:

provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

The committee of scientists formed to advise the Secretary on the formulation of the NFMA guidelines concluded that it was impossible to write specific regulations which would provide for diversity. The scientists stated:

Provision for "diversity" as required by NFMA is one of the most perplexing issues dealt with in the draft regulations. We believe it is impossible to write specific regulations to "provide for" diversity.

44 Fed.Reg. 26600–01. The regulation ultimately adopted by the Secretary, contained in 36 C.F.R. § 219.26, provides as follows:

Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices. (Refer to § 219.27(g).)

The text of 36 C.F.R. § 219.27(g) provides in part:

Management prescriptions, where appropriate and to the extent practicable, shall preserve and enhance the diversity of plant and animal communities ... so that it is at least as great as that which would be expected in a natural forest and the diversity of tree species similar to that existing in the planning area. Reductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives.

Although the natural forest is used in the regulations as one point of reference for evaluating diversity, the regulations do not imply that diversity can only be achieved by attempting to recreate the conditions of the natural forest.

The Secretary's regulations do not require the planners to use any particular method in their analysis of diversity; rather, they focus on the measurement of the impacts of the proposed management practices on the inventoried flora and fauna of the forest. They direct the Forest Service to select management indicator species of fish and wildlife to ensure viable populations of those species and to provide for research and monitoring. *See* 36 C.F.R. § 219.19. Pursuant to the regulations, the planners identified the principal habitat components of all plants and animals that occur in the Wayne. They then selected management indicator species for the Forest which would be representative species for all habitat types and conducted an inventory and analysis of the habitat requirements of these· species. *See* Plan, Appendix B; DEIS, pp. 3–19 to 3–21 and Appendix C; FEIS, Appendix E. They did all of this with

the assistance of several committees comprised of members of nine Ohio universities, officials of the Ohio Department of Natural Resources and biologists employed by the United States Fish and Wildlife Service. In addition, the planners identified "sensitive species" as a further means of maximizing bio-diversity. *See* Plan, p. 4–44; DEIS, p. 3–22. The Plan and the FEIS both set forth specific procedures and methods for monitoring and evaluating bio-diversity. *See, e.g.,* Plan, pp. 5–1 to 5–13.

 Plaintiffs argue that the Plan does not adequately consider the areas which surround the Wayne. The NFMA regulations expressly state that the diversity requirements apply "within the area covered by a land and resource management plan." 36 C.F.R. § 219.3. Under NFMA forest plans are to govern "units of the National Forest System." 16 U.S.C. § 1604(a). The Forest Service has the discretion to consider conditions surrounding the forest but it is not required to compensate for them in the Forest Plan. Here, the forest planners did consider the area surrounding the Wayne. *See, e.g.,* DEIS, p. C–5; FEIS, pp. 2–24 to 2–29.

Plaintiffs criticize the Plan for failing to provide for bio-diversity by maintaining a natural forest environment. The Wayne, however, is not a natural forest. An estimated fifty percent of the original forest of southeastern Ohio was cleared by 1850. An almost complete removal of the remainder, as well as the second growth, occurred from 1850 to 1880 to fuel the native iron ore smelting industry which consumed all trees down to three to four inches in diameter. A second nearly complete removal of the second and third growth forests occurred again for the charcoal industry between 1880 and 1950. When the Forest Service began acquiring lands for a national forest in the middle 1930's, the Wayne consisted of previously cleared land consisting of a mixture of reverting old fields, eroded areas, and young cutover timber stands. DEIS, Appendix, p. C–3. At present, only nine percent of the Wayne consists of old growth forest. *See* DEIS, Appendix, Table C–1.

The Plan, however, does provide for the development of areas of mature growth within the forest. Management areas 3.3 and 6.1 specify a 120–year rotation. By the end of the fifth decade, almost 30% of the forest will consist of hardwood trees over 100 years old. DEIS, Table 4–30, p. 4–57; ROD, pp. 33–34; FEIS, pp. 2–28 to 2–49. More than 17,000 acres are allocated to old growth in area 6.2 where no timbering will occur. ROD, p. 15. An additional 4,000–plus acres of old growth will occur in other management areas. *Id.* After 50 years there will be a total of 55,000 acres of late successional habitat. *Id.* The percentage of mature forest is increased over the life of the Plan. In response to public comment the area of old growth forest was increased by 6,030 acres. *Id.*

The planners considered the effects of various timber harvesting methods on forest diversity. *See* DEIS, pp. 4–18, 4–21. With respect to clearcutting, the FEIS, p. 2–17, states:

Clearcutting is the method that can slow the change from oak-hickory to the more mesic mixed hardwoods that is presently occurring on the Forest because of natural forces. Oak and hickory are important to a variety of wildlife species on the Forest. . . .

Forest stands of mixed species of trees resulting from clearcutting and changing climatic conditions may be more desirable than many existing stands. Research and diversity survey data have shown that regeneration following the clearcutting method exhibits a diversity of tree species at least as great as what would be expected in a natural forest or what exists today. These Forest stands will be more resistant to insect and disease attacks and provide greater utility for some wildlife.

The goal of diversity under the NFMA is "based on the suitability and capability of the specific land area" and is specifically linked to the "overall multiple-use objectives" of the land management plan. 16 U.S.C. § 1604(g)(3)(B). Diversity is not the controlling principle in forest planning, although it is an important goal to be pursued in the context of overall multiple-use objectives. The Court concludes that the Plan provides diversity of plant and animal communities while balancing a mix of multiple uses.

While the alternatives and mix of uses that the forest planners chose were not those favored by the plaintiffs, the Plan does meet the requirements of the applicable statutes and regulations, is well within the discretion vested in the Forest Service and is not arbitrary and capricious.

*CONCLUSION*

The Court concludes that in adopting the Plan for the Wayne, the Forest Service considered all of the relevant factors, and the Court is not persuaded that the Forest Service has committed any clear errors of judgment in adopting the Plan. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. The Secretary's decision is entitled to a presumption of regularity. *Id.* at 415, 91 S.Ct. at 823; *Druid Hills Civic Association v. Federal Highway Administration,* 772 F.2d 700, 714 (11th Cir.1985). As the Court noted in *Resources Limited, Inc. v. Robertson,* 789 F.Supp. 1529, 1540 (D.Montana 1991), "the Forest Service is faced with a nearly impossible task of serving many different interests." Here, the agency, after considerable review, analysis and public involvement, chose an alternative which attempts to strike a reasonable balance between and among all of the competing uses. Plaintiffs disagree with the selected alternative but it is not for the courts to decide whether the decision was necessarily the best one or the one the Court would have chosen. Congress has vested the Forest Service with the discretion to make these decisions, and its decisions must be upheld by the courts unless they are arbitrary, capricious or contrary to law. Plaintiffs have failed to show that in adopting the Plan for the Wayne, the Forest Service acted arbitrarily or capriciously or that the Plan is contrary to law.

In accordance with the foregoing, defendants' motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied. The clerk shall enter final judgment in favor of the defendants dismissing plaintiffs' complaint with prejudice at plaintiffs' costs.

It is so ORDERED.